**McDONNELL DOUGLAS CORPORATION and General Dynamics Corporation, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 91–1204C.**

United States Claims Court.

Feb. 20, 1992.

Francis M. Gaffney, Sonnenschein, Nath & Rosenthal, St. Louis, Mo., for plaintiff McDonnell Douglas Corp., Herbert L. Fenster and David A. Churchill, McKenna & Cuneo, Washington, D.C., for plaintiff General Dynamics Corp.

Mary Mitchelson, Thomas P. McLish, Steven L. Schooner, Anthony A. Anikeeff, Phyllis Jo Baunach, Robert Kirschman, Bryant G. Snee, and Jeri K. Somers, Dept. of Justice, Washington, D.C., for defendant, Stephen R. O'Neil, Robert E. Eberly Jr., Louis R. Newman, and Daniel V. Wentzell, Dept. of the Navy, Washington, D.C., of counsel.

## OPINION AND ORDER

HODGES, Judge.

This case comes before the court on defendant's motion to dismiss for lack of jurisdiction. We find that plaintiffs' claims and defendant's termination for default are properly before this court for the reasons stated below. Defendant's motion to dismiss is therefore denied in part.

## FACTS

In 1984, the Department of the Navy introduced the Advanced Tactical Aircraft Program (A–12) to develop a carrier-based, low observable (Stealth) attack aircraft. The Navy asked four defense contractors to form teams to compete for the A–12 Studies and Full Scale Engineering Development contracts. These contractors included McDonnell Douglas Corporation and General Dynamics Corporation (plaintiffs), who agreed to bid for the contracts as a team.

Plaintiffs' November 2, 1984 Teaming Agreement provided that the contractors would respond jointly to A–12 Requests for Proposals. The parties also agreed to an integrated organizational system to manage and allocate A–12 work equally.

The scope of the teaming relationship was described in Section 10:

10. *Teaming Relationship*

10.1 This Agreement provides exclusively for a teaming relationship and related technology exchange with respect to the [A–12] System and variants or derivatives thereof, specifically including other new tactical aircraft designed for substantially the same mission roles and performance requirements, and the correlative rights and duties of the Parties. . . . [T]his Agreement is not intended to and shall not in any way abridge, limit or restrict the rights of either Party to pursue, either independently or in conjunction with any other person or entity, business opportunities relating to products other than the System, including products in competition with the System. *This Agreement does not constitute and shall not be construed or given effect as a joint venture, partnership, pooling arrangement, or other formal business organization, or as creating any fiduciary relationship.* Except as expressly provided herein, nothing herein shall be construed as providing for the sharing of profits or loss, nor shall either Party be liable to the other for any of the costs, expenses, risks, or liabilities arising out of the other's activities in connection with the performance of programs outside this agreement. (emphasis added)

Plaintiffs submitted a joint proposal for the A–12 Full Scale Engineering Development contract, and were awarded the contract in January 1988. Plaintiffs' representatives executed a single contract to bind their respective corporations. The contract contained standard terms, but a special provision was inserted to hold the team members responsible for their actions:

H–44 *JOINT AND SEVERABLE LIABILITY*

If this contract is awarded to contractors whose contractual relationship with the government will be as a team, this clause shall apply. McDonnell Aircraft Company and General Dynamics Fort Worth Division shall be jointly and severably liable for all obligations of this contract. It is specifically agreed that the liability of the parties to the Government under this contract shall not be limited by any provision of the Teaming Agreement relating to the division of responsibility or by any other provision of the Teaming Agreement.

The contract required that team members have the capacity to produce the aircraft independently and to compete against each other in production.

Problems developed during performance, and plaintiffs requested that the contract be restructured. Instead, the Navy issued plaintiffs a cure notice on December 17, 1990. On December 31, plaintiffs submitted equitable adjustment requests totalling $1,401,181,205. The requests did not demand a Contracting Officer's final decision "in light of on-going discussions and the mutually perceived desire to restructure the program."

The requests included two certifications, one from each contractor. The president of General Dynamics Corporation signed one of the certifications:

### CERTIFICATE

Herbert F. Rogers, the Senior General Dynamics Corporation official in charge at the General Dynamics Fort Worth Division, hereby certifies, that this claim is made in good faith, the supporting data are accurate and complete to the best of the company's knowledge and belief, and the amount requested accurately reflects the contract adjustment, under the A–12 FSD contract and/or a contract implied-in-fact, for which the company believes the government is liable. This certificate extends only to those elements of the claim as to which General Dynamics has estimated a pricing impact, and neither company certifies to the pricing of amounts for which the other company has estimated the government is liable.

Mr. G.A. Johnston signed the second certification, and identified himself as "the Senior McDonnell Douglas Corporation official in charge at McDonnell Aircraft Company." The body of the second certification duplicated that submitted by General Dynamics.

The Contracting Officer issued a January 7, 1991 decision terminating the contract for default. The decision was designated "final" and included a disclosure that plaintiffs could appeal to this court within 12 months. The decision was followed by a February 5, 1991 letter demanding return of $1,352,459,644 in unliquidated progress payments as a result of the termination. The Navy demanded payment by check and stated that interest would begin to accrue after 30 days.

The letter informed plaintiffs of their administrative rights to obtain a review of their indebtedness and "an opportunity to make a written agreement with the head of the agency to repay this debt." The letter did not advise plaintiffs of their appeal rights pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–613 (1988).

On the day the demand letter was issued, plaintiffs contested the demand for return of progress payments and signed a Deferment Agreement with the Navy. The agreement described the demand as a government claim, and acknowledged plaintiffs as individual contractors responsible for the payments. Representatives of the contractors signed the agreement on behalf of their respective corporations.

On February 18, 1991, plaintiffs advised the Government that their December 31, 1990 requests were claims which had been constructively denied by the Navy's decision to terminate the contract. If plaintiffs' claims were not denied, the team requested a Contracting Officer's decision.

The Contracting Officer advised plaintiffs on February 22, 1991 that the certifications attached to their December 1990 requests were defective because either the team or each team member should have certified the claims. The Contracting Officer further noted that plaintiffs' certifying language was "impermissibly qualified and vague."

Defendant informed the contractors of another defect in their submission on May 16, 1991: "[Y]ou have never furnished to the contracting officer, either with or without the required CDA certifications, a package containing the requisite factual detail and supporting documentation necessary to fulfil the statutory and regulatory requirements of a 'claim'."

Plaintiffs filed new certifications for their December requests on June 7, 1991. These were almost identical to those attached to their December requests. One certification was signed by the vice chair-

man of General Dynamics Corporation and the other by the president of McDonnell Aircraft Company. These officials also signed an alternative joint certification:

### CERTIFICATE

#### [Joint Certification]

Herbert F. Rogers, the Senior General Dynamics Corporation official in charge at the General Dynamics Fort Worth Division, and J.F. Capellupo, the Senior McDonnell Douglas Corporation official in charge at the McDonnell Aircraft Company, a Division of the McDonnell Douglas Corporation, hereby certify on behalf of the General Dynamics— McDonnell Douglas Aircraft A-12 Contractor Team, that this claim is made in good faith, the supporting data are accurate and complete to the best of the Contractors' knowledge and belief, and the amount requested accurately reflects the contract adjustment, under the A-12 FSED contract and/or a contract implied-in-fact, for which the Contractor Team believes the government is liable.

The alternative certification was intended to protect plaintiffs if the government's position were upheld.

Also on June 7, plaintiffs filed suit in this court pursuant to the Contract Disputes Act, 41 U.S.C. § 609(a) (1988). Their complaint included the following requests for relief: (1) grant plaintiffs' December 31, 1990 equitable adjustment requests, (2) convert the termination for default to one for convenience, (3) deny defendant's demand for return of progress payments, (4) award performance costs and reasonable profit, (5) award settlement expenses, and (6) award damages for breach of contract.

Plaintiffs submitted to the Navy a $1,286,127,692 termination for convenience cost proposal on June 26, 1991, and amended it on July 26, 1991. Both proposals contained certifications identical to those submitted on June 7, 1991.

After receiving plaintiffs' requests, the Contracting Officer ruled that all of the certifications were defective. Furthermore, the protective joint certifications of June 7, June 26, and July 26, 1991 were conditional and therefore invalid. In a letter dated August 5, 1991, the Contracting Officer advised plaintiffs that he would not consider their requests further because a complaint had been filed. No further action would be taken regarding these requests without direction from the court.

Defendant filed a motion to dismiss on August 7, 1991. On September 16, 1991, the court granted plaintiffs' motion for leave to file an amended complaint seeking termination for convenience costs as set forth in the contractors' June 26, 1991 cost proposal. On December 31, 1991, plaintiffs filed a notice pursuant to RUSCC 20(a)(1), advising the court that "McDonnell Douglas/General Dynamics Team" had been added to the suit as a plaintiff.

For the purposes of this Opinion, two factors determine whether this court may accept jurisdiction of any part of this case. These are (1) plaintiffs' December 31, 1990 equitable adjustment requests for $1,401,181,205 and (2) defendant's termination of plaintiffs' contract for default and its demand for return of unliquidated progress payments totalling $1,352,459,644.

### DECISION

#### I.

■ Defendant opposes jurisdiction in the United States Claims Court alleging lack of privity, improper certification, and insufficient supporting data. We address these issues as follows:

#### A. Privity

Defendant argues that the Teaming Agreement created an entity separate from the contractors. The team, not the contractors, signed the contract and later performed the work. Accordingly, only the team is in privity of contract with the Government. Without the team as plaintiff, defendant contends that the court lacks jurisdiction to proceed. *E.g., United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550–51 (Fed.Cir.1983) (privity of contract necessary under the CDA for a contractor to file a suit in this court); *accord*

*Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984).

Defendant directs the court's attention to plaintiffs' joint Best and Final Offer submitted in accordance with the Federal Acquisition Regulations (FAR), 48 C.F.R. § 15.611(d) (1987): "Following evaluation of the best and final offers, the contracting officer ... shall select *that source* whose best and final offer is most advantageous to the Government...." (emphasis supplied). Defendant interprets this provision to require the award of a contract to a single entity.

Because the offer was submitted jointly, the Government contends that it contracted with the team entity, not individual corporations. It cites legislative history for the proposition that Congress wanted government contracts to be administered through a "single point of contract approach" in order to expedite the resolution of disputes. S.Rep. No. 1118, 95th Cong., 2d Sess. 16–17, *reprinted in* 1978 U.S.C.C.A.N. 5235, 5250–51.

Defendant points to the FAR definition of a "contractor team arrangement" at 48 C.F.R. § 9.601 (1987): "(a) Two or more companies form a partnership or joint venture to act as a potential prime contractor; or (b) A potential prime contractor agrees with one or more other companies to have them act as its subcontractors under a specified Government contract or acquisition program." Defendant would include plaintiffs under one of these categories, requiring either the team or prime contractor to certify the claims.

In response, plaintiffs cite their Teaming Agreement and the contract to show that the Government signed a single contract with two independent prime contractors. Plaintiffs emphasize the fact that the contract called for competition between team members to produce the aircraft after the development stage.

The record shows that the Navy specifically directed prospective contractors to form teams to compete for the A–12 contract. Plaintiffs joined in their Teaming Agreement to comply with the Navy's directive. The record includes no evidence that the Navy considered plaintiffs' agreement to be unsatisfactory or improper. The Teaming Agreement advised the Government that plaintiffs' relationship did not create a joint venture or other formal business organization. It called for two prime contractors to work jointly on A–12 projects in a team effort pursuant to the Navy's directive.

Plaintiffs worked on the contract as equals and retained their corporate independence. No prime/subcontractor relationship existed. Accordingly, plaintiffs did not perform the contract under a "contractor team arrangement" as defined by the FAR. The definition of "contract" at 48 C.F.R. § 2.101 (1987) sets no limitation on the number of prime contractors and nothing in the FAR prohibits the Government from contracting with two prime contractors.

The Joint and Severable Liability clause of the contract held plaintiffs accountable for their actions. The clause demonstrates the Government's understanding of the teaming relationship at the time the contract was awarded—two prime contractors working jointly to complete the job. Had the Government contracted with plaintiffs in a "team arrangement" as defined at 48 C.F.R. § 9.601 (1987), no such clause would have been necessary.

Plaintiffs were prime contractors, and they were in privity with the Government; it is not necessary for "The Team" to be a party. Plaintiffs properly filed suit in this court.

B. The December 31, 1990 Certifications

Defendant argues that plaintiffs' December 31, 1990 certifications are qualified and therefore defective. It also contends that the officers who certified the claims did not have authority to bind the team.

■ The Contract Disputes Act, 41 U.S.C. § 605(c)(1) (1988), requires a contractor to certify claims over $50,000: "[T]he contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the

contract adjustment for which the contractor believes the government is liable." The certification requirements are jurisdictional and cannot be waived. *Thoen v. United States,* 765 F.2d 1110, 1116 (Fed.Cir.1985).

Plaintiffs' certifications contained language which limited their applicability, in that each contractor certified only those elements for which it could estimate a pricing impact. Neither contractor certified the pricing of elements requested by the other contractor. Defendant interprets this as an attempt to evade the CDA requirement that a contractor should certify all portions of its claim.

■ A certification need not be embodied in a single correspondence. *See United States v. General Electric Corp.,* 727 F.2d 1567, 1569 (Fed.Cir.1984) (contractor's certification which failed to include an assertion that the Government was liable, substantially complied with the CDA by making this assertion in the attached documents). Each prime contractor certified its portion of the claims. The certifications together contained the necessary elements and made the assertions necessary for a proper certification.

Plaintiffs' corporate presidents had the authority to bind their respective corporations and they had the authority to certify the claims before the court. 48 C.F.R. § 33.207(c)(2) (1987). No argument to the contrary has been made. Defendant merely stresses that the other party to its contract was a team entity. We do not agree.

Plaintiffs were dual prime contractors who certified their own pricing information in the claims. It would not have been proper for one contractor to certify data which was exclusively within the other's province. No provision of the CDA or its implementing regulations requires dual prime contractors to submit a joint certification to the Government. We hold that the certifications substantially complied with CDA requirements. *Id.* at 1569.

Defendant also argues that we lack jurisdiction to proceed because plaintiffs failed to submit an unconditional certification from an individual who could bind the team. We have ruled that the Teaming Agreement did not create a separate entity, so it is not necessary to address this argument further.

C. Sufficiency of the Supporting Data

Defendant's final attack on the December 31, 1990 claims lies in an obscure sentence found in a May 16, 1991 letter to the contractors. The Contracting Officer advised plaintiffs that their requests lacked sufficient supporting data to meet the CDA requirements of claims.

■ The Contract Disputes Act does not require a particular form for a claim to the Contracting Officer: "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987) (citing *Tecom Inc. v. United States,* 732 F.2d 935, 936–37 (Fed.Cir.1984)); *Metric Constr. Co. v. United States,* 1 Cl.Ct. 383, 392 (1983).

■ To determine whether a "claim" meets all of the CDA requirements, one must examine the entire submission. *Contract Cleaning,* 811 F.2d at 592; *see also R & R Enterprises,* ASBCA No. 41,382, 91–2 B.C.A. (CCH) ¶ 23,707 at 118,677, 1992 WL 30189 ("adequate notice" requirement in *Contract Cleaning* requires the contractor to submit information "sufficient to enable the contracting officer to undertake a meaningful review of the claim").

■ Plaintiffs' December 31, 1990 requests notified the Contracting Officer of the basis for their claims and they quantified the amounts. The requests gave the Contracting Officer enough information to conduct a meaningful review of plaintiffs' requests, and thus complied with the CDA.[1] *Contract Cleaning,* 811 F.2d at 592.

---

1. The December requests for equitable adjustment were converted to claims under the CDA by plaintiffs' February 18, 1991 letter requesting a final decision. The parties had stopped negotiating plaintiffs' equitable adjustment requests and a dispute had arisen between the parties.

## II.

Defendant opposes its own claim for return of progress payments because potentially this claim creates an alternative source of jurisdiction for this court to review the termination. That is, if defendant terminates a contract for default, and demands return of progress payments because of that default, arguably this presents a case appropriately to be resolved by this court. The termination for default becomes an adjunct to the claim for return of progress payments, a monetary claim.

### A. Demand for Unliquidated Progress Payments

■ Defendant argues that the Navy failed to include all elements of a final decision in its February 5, 1991 letter as set forth in the FAR, 48 C.F.R. § 33.211(a)(4) (1987). Thus, no final decision was issued and this court lacks jurisdiction over the demand. 41 U.S.C. § 605 (1988). In addition, the Government contends that the February letter did not rise to the level of a government claim because a dispute between the parties had not occurred. *Dawco Constr., Inc.,* 930 F.2d at 877; *Dynalec Corporation,* ASBCA No. 40860, 91–1 B.C.A. (CCH) ¶ 23,553, 1990 WL 235592 (1990) (citing *Crippen & Graen Corp. v. United States,* 18 Cl.Ct. 237 (1989)).

It was not necessary for the Navy's February correspondence to comply with all requirements of 48 C.F.R. § 33.211(a)(4) (1987) to be considered a final decision. *Placeway Constr. Corp. v. United States,* 920 F.2d 903, 906–07 (Fed.Cir.1990) (setoff considered a government claim without the boilerplate language usually associated with a decision). The February letter was a demand for the return of progress payments. After the letter was issued, plaintiffs informed the Navy that they disputed the demand. With the dispute present, the parties entered into the Deferment Agreement.

The Deferment Agreement contained recitals to the effect that the Contracting

*Dawco Constr., Inc. v. United States,* 930 F.2d 872, 878 (Fed.Cir.1991) (dispute necessary for a

Officer had demanded payment of $1,352,-459,644; that the contractors would appeal the "final decision" of the Contracting Officer to the Board or to this court; that the contractors had requested deferment of collection action by the Government "regarding the amount demanded by the Contracting Officer"; that the contractors were jointly and severably liable for the amount demanded; and that collection of the government's claim would be deferred.

Thereupon, the contractors acknowledged the government's demand in the amount of $1,352,459,644; they "disagree[d] that any amount is due to the Government"; they agreed to pay interest in the amount demanded; and they reserved the right to "pay to the Government all or any of the amount determined to be due by the Contracting Officer's decision."

In return, the Government agreed to take no action "to enforce collection of the amount demanded" pending action by the court; and reserved the right to require immediate payment of $1,352,459,644 should plaintiffs fail to "file suit in the Claims Court on the Contracting Officer's final decision...."

The Deferment Agreement constituted a final decision under the facts of this case. It contained the necessary elements of a final decision and exhausted plaintiffs' administrative remedies. *See Placeway,* 920 F.2d at 906–07. Nothing in the Deferment Agreement suggests that the parties intended to negotiate further, or even to discuss the amounts demanded.

### B. The Default Termination

Defendant argues that we lack jurisdiction to decide the default termination, a non-monetary claim, unless it is tied and subordinate to a money claim. *Austin v. United States,* 206 Ct.Cl. 719, 723 (1975). Because neither plaintiffs' claims nor the government's claim for return of progress payments meets this criterion, the court lacks jurisdiction. *Id.* at 723.

request to be converted into a claim).

*Austin* involved a Navy enlisted man's petition to the court for correction of his military records and for award of back pay. *Austin*, 206 Ct.Cl. at 721. The *Austin* case interpreted one of our jurisdictional statutes, 28 U.S.C. § 1491(a)(2) (1988):

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States.

The Court of Claims noted that the affirmative relief mentioned in the first sentence "can be given only where a money judgment is entered; that is the 'judgment' of which the statute speaks." *Id.* at 723. We agree. However, this is not a military pay case, as was *Austin* and the cases relied upon by the *Austin* court.

■ The court's reference to a declaratory judgment being "tied and subordinate to" a money claim is not applicable to this government contract case in light of the recent decision in *Overall Roofing & Constr., Inc. v. United States*, 929 F.2d 687 (Fed.Cir.1991). The issue in *Overall Roofing* was "whether the Claims Court has jurisdiction over a case contesting only the propriety of a termination for default and presenting no claim for money; in other words, one asking only for a declaratory judgment that the termination was wrongful." *Overall Roofing*, 929 F.2d at 687–8. This was the only issue in *Overall,* and the answer was No.

■ In comparing the court to the Boards of Contract Appeals, the Federal Circuit noted, "In light of the greater formality of the Claims Court ... the more efficient approach is to appeal all issues together." *Overall Roofing*, 929 F.2d at 690. It did not say the issues should be tied, or even associated. This indicates to us that a money claim must be presented with the termination claim at the time the complaint is filed.

The legislative history of 28 U.S.C. § 1491(a)(2) (1988) shows that Congress wanted this court to hear all aspects of a case together, just as the Federal Circuit ruled in *Overall Roofing.* The first part of § 1491(a)(2) addresses civilian and military pay cases. "In those cases, the Court of Claims can grant a monetary judgment but cannot alter the serviceman's military status. This bill would permit the Court of Claims to grant such military personnel relief collateral to and consistent with the judgment.... [W]hen the Court of Claims does have jurisdiction over any case before it, this bill will enable the court to grant all necessary relief *in one action.*" (emphasis supplied). H.R.Rep., No. 92–1023, 92d Cong., 2d Sess. 3 (1972).

The House Report concludes as follows: "It is the opinion of this committee that the aim of modern practice [is] to avoid repetitive lawsuits and to make it possible to dispose of all the claims and to adjudicate all of the rights of the parties in a single proceeding.... The committee has concluded that [this amendment] would improve the administration of justice in the Court of Claims by simplifying the procedure and reducing the costs incurred in litigation and in the pursuit of administrative remedies." *Id.* at 4.

The stated aim of Congress, as well as that of the Federal Circuit in *Overall Roofing,* was to encourage this court to resolve related issues in one proceeding. This case is one which Congress and the Federal Circuit direct us to "appeal all issues together." *Overall Roofing*, 929 F.2d at 690.

If *Overall Roofing* could be construed to require some type of relationship between the termination and a monetary claim, plaintiffs' claims and defendant's demand for the return of unliquidated progress payments would satisfy this condition. The reasons for defendant's termination for default are intertwined with the reasons for which plaintiffs seek the additional money in the December requests. Defendant's demand for return of progress payments was an integral part of the termination for default.

The Claims Court has held the government's demand for return of progress payments to be the monetary aspect of the termination for default. *Sharman Co. v. United States*, 24 Cl.Ct. 763 (Cl.Ct.1991). When a contract is terminated for default, "the boundaries of a Government claim,' as defined by procurement regulations, have been marked out. The issuance thereafter of a contracting officer's demand for return of unliquidated progress payments is simply a quantification of the Government's claim rather than the assertion of a new or different demand." *Sharman*, 24 Cl.Ct. at 767. The court found that the amount of the government's claim was not in dispute; rather, the government's right to assert default was the issue. In that circumstance, the "final decision" was surplusage. The government's demand for return of progress payments was itself the monetary aspect of the termination for default. *Id.*, at 767.

We do not reach the *Sharman* issues because the Deferment Agreement was tantamount to a final decision under the facts of this case. Furthermore, the requirements of *Overall Roofing* are met by the monetary claims.

## CONCLUSION

We reviewed classified documents referred to in the record to determine the intent of the parties to this contract. The substance of these documents is not included so that the Opinion itself would not be classified. However, the documents are compatible with this Opinion, particularly as it relates to defendant's arguments concerning privity.

The court takes this opportunity to urge the parties once again to settle this case. Common sense suggests that it should not be tried, and settlement should occur early in the process rather than later. Recently, defendant has shown a willingness to consider settlement in the public interest. We encourage this approach.

The court will agree to a reasonable time for the parties to discuss settlement at the appropriate levels; we have offered offices to facilitate such discussions. However, the parties are advised that this case will proceed in accordance with normal practice in absence of settlement. Counsel will submit proposed trial dates and reasonable deadlines for discovery. The court will issue a schedule for summary judgment motions on Count II of the complaint. Summary judgment motions on other Counts may not be filed at this time, unless they are closely related to the merits of Count II.

1. Defendant's motion to dismiss is DENIED in part.

2. On or before March 23, 1992, plaintiffs will brief defendant's assertion that we lack jurisdiction to hear post-complaint claims. Defendant may respond on or before April 10, 1992.

3. The court will entertain a motion to remove "McDonnell Douglas/General Dynamics Team" as plaintiff.

SO ORDERED.