**FAIRCHILD INDUSTRIES, INCORPORATED, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 94–5116.

United States Court of Appeals, Federal Circuit.

Nov. 29, 1995.

As Modified Feb. 23, 1996.

Albert G. Lauber, Jr., Caplin & Drysdale, Chartered, Washington, D.C., argued for plaintiff-appellant. With him on the brief were Ralph A. Muoio and Julie W. Davis.

Steven I. Frahm, Attorney, Department of Justice, Washington, D.C., argued for defendant-appellee. With him on the brief were Loretta C. Argrett, Assistant Attorney General, Gary R. Allen and Jonathan S. Cohen, Attorneys.

Alexander Zakupowsky, Jr. and Alan I. Horowitz, Miller & Chevalier, Chartered, Washington, D.C., were on the brief for the Amicus Curiae, Aerospace Industries Association of America, Inc.

Before RICH, NEWMAN, and SCHALL, Circuit Judges.

NEWMAN, Circuit Judge.

This case requires interpretation of the statute governing research tax credits under section 44F of the Internal Revenue Code of 1954, as applied to certain of the research costs incurred by Fairchild Industries, Inc. in a fixed-price incentive contract with the government. On Fairchild's appeal of the decision of the United States Court of Federal Claims,[1] we conclude that the court erred in its interpretation of the statute and regulations.

## THE RESEARCH TAX CREDIT

The research tax credit was established by the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 221(a), 95 Stat. 172, 241.[2] Section 44F provides a tax credit of 25% of increased research expenditures compared with a baseline measured by the previous three years' research expenditures:

GENERAL RULE—There shall be allowed as a credit against the tax imposed by this chapter for the taxable year an amount equal to 25 percent of the excess (if any) of—

(1) the qualified research expenses for the taxable year, over

(2) the base period research expenses.

I.R.C. § 44F(a); 26 U.S.C. § 44F(a). Section 44F(d) defines "qualified research":

QUALIFIED RESEARCH—For purposes of this section the term "qualified research" has the same meaning as the term research or experimental has under section 174, except that such term shall not include—

(1) qualified research conducted outside the United States,

(2) qualified research in the social sciences or humanities, and

(3) qualified research to the extent funded by any grant, contract, or otherwise by another person (or any governmental entity).

■ The tax code does not define "funded" as the term is used in § 44F(d)(3). However, Treasury Regulation § 1.41–5(d)(1), 26 C.F.R. § 1.41–5(d)(1), sets the criterion for "funded" on which this case turns, *viz.* whether payment for the research is "contingent on [its] success":

*In general.* Research does not constitute qualified research to the extent it is funded by any grant, contract, or otherwise by

1. *Fairchild Indus., Inc. v. United States*, 30 Fed. Cl. 839 (1994).

2. The Tax Reform Act of 1984, Pub.L. No. 98–369, §§ 471(c), 474(i)(1), 98 Stat. 494, 826, 831 redesignated § 44F as § 30 of the Internal Revenue Code of 1984. The Tax Reform Act of 1986, Pub.L. No. 99–514, § 231(d)(2), 100 Stat. 2085, 2178 redesignated § 30 as § 41 of the Internal Revenue Code of 1986. We shall continue to refer to § 44F, the designation in effect for the tax years at issue.

another person (including any governmental entity). All agreements (not only research contracts) entered into between the taxpayer performing the research and other persons shall be considered in determining the extent to which the research is funded. Amounts payable under any agreement that are contingent on the success of the research and thus considered to be paid for the product or result of the research (see § 1.41–2(e)(2)) are not treated as funding.

The regulations contain "mirror image" rules for determining when the customer for the research, rather than the researcher, is entitled to claim the tax credit. In accordance with Treasury Regulation § 1.41–2(e)(2) the contractual arrangement is the factor that determines who is entitled to the tax benefit, for the customer may claim the credit only if the agreement requires the customer to pay for the research even if it is unsuccessful. If, however, the customer need not pay unless the research is successful, the customer has "paid for the product or result rather than the performance of the research" and can not claim the tax credit because it has assumed no risk. *Id.* Thus, the regulations implement allocation of the tax credit to the person that bears the financial risk of failure of the research to produce the desired product or result.

Congress intended that the research tax credit would provide an incentive to American industry to invest in research. The overarching purpose was to "reverse [the] decline in research spending by industry" and to induce companies "to bear the significant costs ... which must be incurred to initiate or expand research programs in a trade or business." Staff of Jt.Comm. on Taxation, 97th Cong., 1st Sess., General Explanation of the Economic Recovery Tax Act of 1981 120–21 (Jt.Comm.Print 1981). The House Report further explained that:

> The committee believes that a substantial tax credit for incremental research and experimental expenditures will overcome

the resistance of many businesses to bear the significant costs of staffing, supplies, and certain computer charges which must be incurred in initiating or expanding research programs.

H.R.Rep. No. 201, 97th Cong., 1st Sess. 111 (1981).

The legislative evolution of I.R.C. § 44F records the care with which this provision was written, from an initial bill that exempted all research "performed for another person," to the later bill that as amended and enacted contained the "funded" qualification. The Joint Committee Print recognized the substantive change whereby the bill as enacted denied the credit only when research was "funded" by another, whether or not it was performed for another. Moreover, the implementing regulations explicitly state that the credit is available even when another entity pays for the research, provided that the payment is contingent on the success of the research. Treas.Reg. § 1.41–5(d)(1).

The issue is the application of I.R.C. § 44F and implementing regulations to Fairchild's contract with the Air Force.

## THE FIXED–PRICE INCENTIVE CONTRACT

In July 1982 Fairchild and the Air Force entered into a fixed-price incentive contract [3] whereby Fairchild would design and produce the T–46A aircraft, a "next generation trainer". (NGT) intended for use in training new pilots. The T–46A contract included a full-scale development (FSD) phase and a production phase. In the FSD phase Fairchild was to develop and deliver two prototype aircraft and all necessary support systems. In the production phase, Fairchild was to produce and deliver a target quantity of fifteen additional aircraft. The tax credits at issue relate solely to the FSD phase.

The contract contained over 1,000 pages of technical specifications that required Fairchild to meet specific design, construction, quality, and performance standards. Fair-

---

**3.** A fixed-price incentive contract is described at 48 C.F.R. § 16.403(a) (1994) as:

a fixed-price contract that provides for adjusting profit and establishing the final contract

price by application of a formula based on the relationship of total final negotiated cost to total target cost. The final price is subject to a price ceiling, negotiated at the outset.

child was to bear "total system responsibility" for the installation and integration of all T–46A aircraft elements, described in the contract as follows:

> Total System Responsibility is the responsibility for the installation and integration of the NGT system elements, i.e., its systems, subsystems, components, support equipment, and software/data; including the responsibility for undertaking any and all actions necessary to assure that the total system will meet all requirements as defined in the system specification, 210S100001 dated 21 Apr 82, the Air Vehicle Prime Item Development Specification, 210S310001 dated 21 Apr 82 and the Support Equipment General Specification, 210S1200001 dated 21 Apr 82, all as identified in Section J of this contract. The contractor hereby accepts Total System Responsibility for the NGT System, whether or not its elements are fabricated, manufactured, or assembled by the Prime Contractor, Subcontractor, Vendor/Supplier, or furnished as GFP.

The T–46A aircraft contract provided that the Air Force was obligated to pay for the research only if Fairchild produced results that met the contract specifications, in accordance with certain provisions of the Defense Acquisition Regulations (DAR). Fairchild was entitled to payment only for work product delivered and accepted. DAR 7–302.2 (1976). The contract contained quality assurance procedures whereby the Air Force would evaluate Fairchild's work. If the work was deemed unacceptable, the Air Force could either (1) reject the work, (2) require Fairchild to correct the work at its own expense, or (3) accept the work subject to an equitable price reduction. DAR 7–302.4 (1976). The contract provided that the Air Force could terminate the contract either for default or for the convenience of the government. DAR 7–302.9(a) (1976) (termination for default); DAR 7–103.21(b) (1976) (termination for convenience).

The financing provisions of the contract provided that, if Fairchild was making satisfactory progress, the Air Force would pay bimonthly refundable advances, termed "progress payments," calculated as a percentage of the expenditures Fairchild actually incurred. DAR 7–104.35(a) (1981). Fairchild had no right to retain the progress payments unless the contract line items to which they applied were delivered and accepted. DAR 7–104.35(a), (b) (1981). After formal acceptance of a specific contract line item the progress payment was "liquidated" by crediting it against the total fixed price. In the event the Air Force terminated the contract for default, the contract provided that all unliquidated progress payments were repayable to the Air Force. DAR 7–104.35(h) (1981).

The amended total ceiling price for the FSD phase was $133,485,885. The work was subdivided into eleven contract line items that were separately priced. During 1982–86 Fairchild spent $216,056,000 for the FSD phase of the T–46A contract. By the time Congress cancelled the T–46A program in late 1986, the Air Force had paid Fairchild $53.0 million for successfully completed work and another $60.8 million in progress payments that remained unliquidated. Fairchild and the Air Force agreed to termination for convenience terms. An Air Force audit showed that Fairchild had successfully completed 90% of the FSD work and was entitled to payment of $120.6 million. The $53.0 million in liquidated progress payments and the $60.8 million in unliquidated progress payments were applied to this obligation, and the remaining $6.8 million was paid.

On its 1982–1985 federal income tax returns Fairchild reported a total of $109.4 million of qualified research expenses related to the FSD phase. The Internal Revenue Service disallowed approximately $19.6 million of the reported expenses for reasons not related to this appeal. Of the remaining $89.8 million the Service disallowed 55.8%, or $50.3 million, as having been "funded" by the Air Force within the meaning of I.R.C. § 44F(d)(3). This 55.8% figure represents the ratio of the FSD costs the Air Force ultimately paid ($120.6 million) to Fairchild's total FSD costs ($216.1 million). As a consequence of its decision that the Air Force "funded" 55.8% of Fairchild's research, the Service disallowed $5.8 million in research

tax credits claimed by Fairchild for the 1983 and 1984 tax years.[4]

## DISCUSSION

■ The interpretation of a statute and regulations is subject to plenary review. *Kane v. United States,* 43 F.3d 1446, 1448 (Fed.Cir.1994). The question is whether Fairchild's research expenses were correctly deemed "funded" within the meaning of I.R.C. § 44F(d)(3) and the Treasury regulations. The Court of Federal Claims so held, based on its interpretation that the availability of the tax credit turns on the likelihood that the Air Force would pay Fairchild for the research conducted under the contract. The court stated that Fairchild expected that it would be paid and was paid for the research. The court held that since Fairchild "did not itself incur" the research expenses because the expenses were "funded" by the government, it was not entitled to the tax credit. 30 Fed.Cl. at 850–51.

### A

■ Fairchild's position is that the Air Force "funded" no part of the research because Fairchild's right to payment was "contingent on the success of the research," within the text and intent of the statute and Treasury Regulation § 1.41–5(d)(1). Fairchild argues that research is not "funded" by the customer, here the Air Force, if both (1) payment to the researcher is contingent on the success of the research and (2) the researcher retains substantial rights in the research. We need not decide if this is the correct test in all circumstances, for in this case the parties agree that Fairchild meets the second prong of this proposed test. Thus the only issue is whether payment was contingent on the success of the research.

The government's position is that the determination of whether research is "funded" does not depend on whether the contract reserves to the government the right not to pay for unsuccessful research. The government states in its brief that payment for the research must be "unexpected or surprising"

in order for the contractor to claim the credit; that the credit depends on the "relative likelihood that the sponsor ... will pay"; and that "payment [is] the benchmark in determining whether a sponsor or researcher is entitled to the credit." The Court of Federal Claims correctly held that the availability of the credit does not depend on whether the researcher is in fact paid; it depends, as stated in Treasury Regulation § 1.41–5(d)(1), on whether, by the terms of the research agreement, payment is contingent upon development of a specified "product or result," to be paid "contingent on the success of the research."

However, the Court of Federal Claims erred in holding that Fairchild "did not itself incur" the research expenditures because Fairchild received payments under the contract as its research progressed. The court concluded that because the Air Force advanced money to Fairchild in the form of progress payments and Fairchild expected that it would be paid for the research, "Fairchild's right to payment was not 'contingent' on success as that term is used in the regulation." 30 Fed.Cl. at 850. The court held that it was not controlling that the contract provided for return of the progress payments if the project were not successful, because through the progress payments Fairchild "was spending the government's money to conduct the T–46A research, not its own." 30 Fed.Cl. at 850.

The Court of Federal Claims incorrectly construed the contract between Fairchild and the Air Force. The court concluded that although Fairchild argued that it assumed the risk under the contract, "[t]he facts state otherwise." 30 Fed.Cl. at 849. We disagree. That many of the line items would be successfully produced, such that the progress payments for those items would be liquidated, was not known until the work was successfully done and was accepted by the Air Force. It is incorrect for the court to change, upon successful completion of the contract, the allocation of risk that was es-

---

**4.** Because of carryover and carryback effects, the disallowance affects only the 1983 and 1984 tax years.

tablished in the contract and was present throughout its performance.

■ Treasury Regulation § 1.41–5(d)(1) provides that for the researcher to claim the credit, the amounts payable under the agreement must be contingent on success. The inquiry turns on who bears the research costs upon failure, not on whether the researcher is likely to succeed in performing the project. When payment is contingent on performance, such as the successful research and development of a new product or process, the researcher bears the risk of failure. Whatever risk Fairchild was bearing, the Air Force bore none of it, for the Air Force was liable for payment only when the work, line item by item, succeeded and was accepted.

The contract explicitly placed solely on Fairchild the risk of failure of every line item of FSD. The items to be produced were not commodities: all required research, development, and testing, to meet complex contract specifications. DAR 7–302.4(a) (all work subject to inspection and testing before acceptance); DAR 7–302.2 (payment under the contract made only after acceptance). Fairchild had no right to payment until it fully succeeded in each phase of the project. Undoubtedly Fairchild did not expect to fail in many of these items, perhaps in none of them; and as each line item was successfully completed and accepted and the progress payments for that item liquidated, Fairchild's total exposure was reduced. However, Fairchild remained at risk for each line item until the research was successfully completed and the product of the research was accepted.

■ That Fairchild received "advances" or "progress payments" during the course of performance did not alter the contract provision that Fairchild was not entitled to retain any such payments if it did not successfully produce the product to which the payment related. A progress payment does not commit the agency to accept unsuccessful performance, or to make full or partial payment if the product is not successfully produced. *Marine Midland Bank v. United States*, 231 Ct.Cl. 496, 687 F.2d 395, 398, 401 (1982) (progress payments are loans from the government, to be repaid from the contract price on full performance; progress payments are not partial purchases), *cert. denied*, 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983). *See Nuclear Research Corp. v. United States*, 814 F.2d 647, 651 (Fed.Cir.1987) (requiring return of unliquidated progress payments).

■ The Court of Federal Claims placed weight on whether the researcher itself provided the cash to pay the bills as the work proceeded, in which case the court deemed that the researcher was "assuming the risk that the sponsor will not pay," 30 Fed.Cl. at 849, and thus would be entitled to the credit. Since the Air Force "advanced" funds to Fairchild by way of progress payments, the court denied the credit. The court did not distinguish between "funding," as that term is used in the statute, and the mechanics of financing. However, the contractual relationship that establishes the "funding" also controls who is entitled to the credit, for the contract controls who bears the financial risk of failed research. Treas.Reg. § 1.41–5(d). The government may choose to make progress payments as opposed to having the contractor obtain commercial financing, for the government has the lowest cost of borrowing (thus reducing the contract price), and this arrangement gives the government a priority security interest in the contractor's work product. *See* 10 U.S.C. § 2307(a)(1) & (d) (authorizing agency heads to make advance, partial, progress, or other payments only if the contractor gives adequate security); *Marine Midland Bank*, 687 F.2d at 399 ("the government takes a security interest in the contractor's inventory, to secure the funds loaned to the contractor through progress payments").

■ The system of progress payments does not change their character from a loan to an unrecoverable partial payment. *Id.* Whether or not a congenial "relationship between the parties" might lighten the contractor's risk, as the Court of Federal Claims suggests, the contract itself does not reflect this possibility. Indeed, the record before the Court of Federal Claims was that the Air Force several times reduced the progress payments, and that Fairchild had incurred unrecovered research costs in excess of $95 million in the FSD phase. An *amicus curiae*

cites *McDonnell Douglas Corp. v. United States,* 25 Cl.Ct. 342, 345 (1992), wherein the government demanded that General Dynamics and McDonnell Douglas return more than $1.35 billion in unliquidated progress payments, and *Boeing Co. v. United States,* 25 Cl.Ct. 441 (1992), *rev'd on jurisdictional grounds,* 991 F.2d 811 (Fed.Cir.1993) (Table), reporting that the government had demanded return of over $605 million in progress payments. Both cases have been vigorously litigated and neither is reported as having been resolved.

## B

■ The government takes the position that only under unusually risky and uncertain fixed-price incentive contracts might the researcher be entitled to the tax credit. The government concludes that in almost all situations the credit will not be available because the contractor expects to perform as the contract contemplates, especially when contracting with a governmental body. The government's position is that availability of the credit need not (and can not) be decided until the project is over and the magnitude of the researcher's risk of nonpayment is known. This theory contravenes the declared intent of Congress, for the statute and regulations make none of these distinctions.

This is an incentive statute, designed to divert additional resources to research by reducing the cost of that additional research. Thus the tax credit must be a known factor when making decisions to commit money to research. In harmony with the incentive purpose, the regulations state that the research agreement must be "entered into prior to the performance of the qualified research." Treas.Reg. § 1.41–2(e)(2)(i).

The statute is designed so that those who will bear the risk of financial loss can include the tax credit in their calculation of investment risk. The tax credit can not be an effective incentive if its availability is unknown until after the research money is spent. The government emphasizes what it calls the "wait and see" regulation, Treasury Regulation § 1.41–5(d)(5), which states that:

If at the time the taxpayer files its return for a taxable year, it is impossible to determine to what extent particular research performed by the taxpayer during that year may be funded, then the taxpayer shall treat the research as completely funded for purposes of completing that return. When the amount of funding is finally determined, the taxpayer should amend the return ... to reflect the proper amount of funding.

The government argues that this regulation means that if research "is arguably close to the line of not funded" the taxpayer must pay the full tax and wait and see whether the customer chooses to pay for the research. That is not, however, the focus of this regulation. This regulation by its terms applies only when it is not possible to determine the precise extent of funding at the time the researcher's tax return is filed, for example in joint-venture and other situations illustrated in Treasury Regulation § 1.41–5(d)(6). The regulation does not relate to whether there is "argument" about who provided the funding, but to when the taxpayer obtains the information needed to allocate the credit.

The "wait and see" provision has no impact on Fairchild's fixed-price incentive contract, for that contract expressly authorizes the government to decline payment if the research is not successful. Thus such research is not "funded" as that term is defined in the statute and regulations.

## Conclusion

Fairchild's qualified research expenses under the T–46A aircraft contract were not "funded," as that term is used in § 44F of the Internal Revenue Code of 1954 and Treasury Regulation § 1.41–5(d). Fairchild is entitled to the research tax credit. The decision of the Court of Federal Claims is reversed. The case is remanded to the Court of Federal Claims for further proceedings to determine the amount of Fairchild's qualified research expenses.

## Costs

Costs are taxed in favor of Fairchild.

*REVERSED.*