T.C. Memo. 2021-1

UNITED STATES TAX COURT

EDWARD J. TANGEL AND BEATRICE C. TANGEL, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27268-13, 27309-13,   Filed January 11, 2021.
    27371-13, 27373-13,
    27374-13, 27375-13.

Robert G. Wonish II, Jefferson H. Read, and John H. Dies, for petitioners.

Christa A. Gruber, Mayah Solh-Cade, Danielle R. Dold, and Tess deLiefde, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith: Jeffrey Tangel and Kathleen Tangel, docket No. 27309-13; Lawrence E. Tangel and Karen S. Tangel, docket No. 27371-13; Douglas J. Tangel and Juanita V. Tangel, docket No. 27373-13; Neil R. Tangel and Gyneen W. Tangel, docket No. 27374-13; and Gerald Landry and Colette Tangel, docket No. 27375-13.

[*2]                          MEMORANDUM OPINION

LAUBER, Judge:  The principal question in these consolidated cases concerns petitioners' entitlement to credits under section 41 for increasing research activities.[2]  The Internal Revenue Service (IRS or respondent) disallowed research credits of $929,668 claimed during 2008-2010 by Enercon Engineering, Inc. (Enercon), an S corporation.  These credits flowed through to petitioners as Enercon's shareholders.  Enercon claimed these credits on the basis of "qualified research expenses" allegedly incurred in connection with 142 different projects.

Respondent has moved for partial summary judgment with respect to one of these projects, which Enercon undertook for Vericor Power Systems, LLC (Vericor).  "Qualified research" is defined to exclude "[a]ny research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity)."  Sec. 41(d)(4)(H).  Respondent contends that Enercon's research was 100% funded by Vericor because, under the agreement executed by the parties, Enercon retained no "substantial rights" in the research it performed.  See sec.

_____

[2]All statutory references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*3] 1.41-4A(d)(2) and (3), Income Tax Regs. We agree and will accordingly grant respondent's motion.

## Background

There is no dispute as to the following facts, which are drawn from the petitions, the parties' joint stipulations of facts, the parties' motion papers, and their attached exhibits. Enercon is an S corporation that designs and produces integrated controls and switchgears for custom applications in the power generation industry. In February 2009 Enercon was hired by Vericor to develop, according to existing designs, "a new enclosure for turbine power generation." Enercon was tasked with providing "the assembly, integration, controls, and packaging" for one new turbine generator unit and for redesigning (or retrofitting) three existing Vericor turbine units. Two redesigned units were to be delivered to Vericor on July 15, 2009; the new unit and the other redesigned unit were to be delivered on October 15, 2009. Enercon referred to this work as Project No. 37688.

Enercon and Vericor negotiated a detailed set of contract terms for Project No. 37688. The parties' agreement is embodied principally in a document they refer to as the "Terms and Conditions." Vericor was the primary drafter of this document; as far as the record reveals, it is a version of Vericor's standard contract. After receiving Vericor's proposed Terms and Conditions on February 7,

**[*4]** 2009, Enercon sent Vericor an offer letter dated February 11, 2009. This offer letter summarized Enercon's understanding of the project, including the technical specifications it was being hired to meet and the legal requirements contained in the Terms and Conditions.

Vericor accepted Enercon's offer and submitted to Enercon a series of purchase orders. The first such order, labeled the "General Purchase Order," was for $951,954 and described the four units Enercon had agreed to produce or redesign. As the project progressed, Vericor submitted to Enercon additional purchase orders for additions or modifications, in the nature of "change orders," ranging in cost from $1,371 to $119,683. The General Purchase Order and the change orders incorporate by reference the previously negotiated Terms and Conditions. All told, Project No. 37688 is associated with 19 purchase orders totaling $1,423,847.

Paragraph 15 of the Terms and Conditions, captioned "Designs, Drawings and Data," is the most relevant provision for purposes of the instant motion. Referring to Enercon as the "Seller" and Vericor as the "Buyer," it states:

> A. With respect to Articles for which any technical information, written, oral or otherwise, (i) has been supplied to Seller by or on behalf of Buyer; or (ii) Seller has designed at Buyer's expense; or (iii) Seller has designed specifically to meet Buyer-furnished technical requirements (hereinafter designated "Information"), Seller, in consideration of Buyer's furnishing of such Information and/or design funding, agrees that it will not

**[*5]**  use, or assist others in using, such Information, design funding or tooling to develop or sell such Articles (or similar interchangeable or substitute Articles, or parts thereof) to anyone other than Buyer, either as production, spare or repaired Articles, without Buyer's prior written consent.  Seller shall not use or disclose such Information except in the performance of Orders for Buyer, and, upon Buyer's request, such Information and all copies thereof shall be returned to Buyer.  If Seller develops, sells the Articles hereunder, or assists others in doing so, (or similar interchangeable or substitute Articles, or parts thereof) to anyone other than Buyer, the burden shall be on Seller to establish that Buyer's Information, funding or tooling was not used.

B.  Information prepared by Seller specifically in connection with performance of this Order, including original works of authorship created by Seller, are considered "works made for hire" within the meaning of the U.S. Copyright Laws.  Buyer shall be deemed the author of such works.  If any such work is determined by a court of competent jurisdiction not to be a work made for hire, this Order shall operate as an irrevocable assignment to Buyer of all right, title and interest in and to such work.

C.  Where such information is furnished to Seller's suppliers for use in performance of Buyer's Orders, Seller shall insert the substance of this paragraph 15 in all such orders to Seller's subcontractors.

"Articles" is defined elsewhere in the document as "goods and/or services being procured and described on the face of the Purchase Order."[3]

---

[3]This definition of "Articles" appears in gray italicized font and is hard to read in reproduction.  Petitioners suggest that "procured" should read as "provided" and that "face" should read as "fact."  Although the latter suggestion would produce a rather odd sentence, our interpretation of the agreement would be the same if petitioners' reading were adopted.

**[*6]**  In its offer letter to Vericor, Enercon summarized Paragraph 15 of the Terms and Conditions as follows:

> Designs, Drawings, and Data
> - All information and equipment supplied by Vericor remain in Vericor's ownership
> - All information, equipment, etc generated as a result of this order are owned by Vericor only -- "works for hire"
> - All Enercon's sub suppliers must receive same clause

Enercon timely filed Forms 1120S, U.S. Income Tax Return for an S Corporation, for 2008-2010.  On those returns Enercon claimed total research credits of $929,668, which were passed through to petitioners.  Enercon calculated these credits on the basis of "qualified research expenses," see sec. 41(b), allegedly incurred on 142 separate projects, including Project No. 37688.  In timely notices of deficiency issued to petitioners, the IRS disallowed all flow-through research credits they had claimed, determining that they had not provided sufficient documentation to establish that the requirements of section 41 had been met.

Petitioners timely petitioned this Court for redetermination of the deficiencies.  On September 12, 2017, respondent filed a motion for partial summary judgment limited to Project No. 37688.  Respondent contends that (1) the research Enercon performed in executing this project was 100% funded by Vericor within the

**[\*7]** meaning of section 41(d)(4)(H), and (2) petitioners have not substantiated the amount of qualified research expenses incurred on this project.

In early 2018, while respondent's motion was pending, the parties selected a representative sample of projects to be tried. Two additional projects are to be evaluated separately: Project No. 34788 (because of its large size) and Project No. 37688 (because of the instant motion). The resolution of this motion does not affect petitioners' entitlement to credits for any project except Project No. 37688.

Discussion

A.    Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). We may grant partial summary judgment regarding an issue as to which there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002). The question whether Project No. 37688 involves "funded research" depends on the proper interpretation of the agreement between Enercon and Vericor. We conclude that this question is appropriate for summary adjudication. Given our conclusion that Enercon's research was 100% "funded," we need not address respondent's arguments about substantiation.

**[*8]** B.     Statutory and Regulatory Framework

Section 41 allows a credit to taxpayers who increase their research expenses above a base amount. Sec. 41(a), (c). "Qualified research expenses" include in-house research expenses and contract research expenses. Sec. 41(b)(1). "In-house research expenses" include wages paid to employees who engage in (or directly supervise) qualified research and amounts paid or incurred for supplies used in the conduct of qualified research. Sec. 41(b)(2). "Contract research expenses" are amounts paid by a taxpayer to a person other than an employee to perform quali-fied research. See sec. 41(b)(3).

When a contractor such as Enercon performs research in fulfilling a contract with its customer, each party may have a possible claim to the research credit: Enercon's credit would be based on its in-house research expenses and Vericor's would be based on its contract research expenses. To prevent double claiming of the credit and to determine which contracting party is entitled to the credit, the statute provides that qualified research does not include "funded research." Sec. 41(d)(4)(H). "Funded research" is defined as "[a]ny research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity)." Ibid. No credit is allowed to a contractor to the extent its research is funded by a third party.

**[\*9]** The regulations governing "funded research" appear in section 1.41-4A(d), Income Tax Regs.[4] To determine whether research is "funded," the regulations direct our focus to the agreement(s) executed by the contracting parties: "All agreements (not only research contracts) entered into between the taxpayer performing the research and other persons shall be considered in determining the extent to which the research is funded." Id. subpara. (1).

The regulations specify two main factors as relevant in ascertaining whether research is "funded." First, "[a]mounts payable under any agreement that are contingent on the success of the research * * * are not treated as funding." Ibid. In such circumstances the party performing the research is entitled to the credit because it bears the risk of failure. See sec. 1.41-2(e)(2), Income Tax Regs.; see also Fairchild Indus., Inc. v. United States, 71 F.3d 868, 870 (Fed. Cir. 1995). Petition-

_____

[4]The Department of the Treasury (Treasury) initially promulgated regulations addressing "qualified research" in 1989. See T.D. 8251, 1989-1 C.B. 3. The regulation governing "funded research" originally appeared as sec. 1.41-5(d), Income Tax Regs., which was captioned "Qualified research for taxable years beginning before January 1, 1986." See T.D. 8251, 1989-1 C.B. at 9-10. As part of revised regulations issued in 2000, Treasury redesignated sec. 1.41-5 as sec. 1.41-4A, Income Tax Regs. See T.D. 8930, 2001-1 C.B. 433, 449. Although sec. 1.41-4A, Income Tax Regs., retains its original caption, paragraph (d) thereof is applicable for the tax years at issue. See sec. 1.41-4(c)(9), Income Tax Regs. ("Qualified research does not include any research to the extent funded by any grant, contract, or otherwise * * * . To determine the extent to which research is so funded, § 1.41-4A(d) applies.").

**[\*10]** ers do not contend that Vericor's payments to Enercon were "contingent on the success of the research," so this first factor does not apply here.

Second, the regulations provide that a taxpayer is entitled to the credit only if it "retains substantial rights in the research." Sec. 1.41-4A(d)(3)(i), Income Tax Regs. "If a taxpayer performing research for another person retains no substantial rights in research under the agreement providing for the research, the research is treated as fully funded * * * , and no expenses paid or incurred by the taxpayer in performing the research are qualified research expenses." Id. subpara. (2). This would be true, for example, "if the taxpayer performs research under an agreement that confers on another person the exclusive right to exploit the results of the research." Ibid. A taxpayer likewise "does not retain substantial rights in the research if the taxpayer must pay for the right to use the results of the research." Id. subpara. (3)(i). "Incidental benefits to the taxpayer from performance of the research (for example, increased experience in a field of research) do not constitute substantial rights in the research." Id. subpara. (2).

If a taxpayer performing research for another person does retain substantial rights in the research, the research is nevertheless deemed funded "to the extent of the payments (and fair market value of any property) to which the taxpayer becomes entitled by performing the research." Id. subpara. (3)(i). If the taxpayer's

**[*11]** total research expenses exceed the amount of "funding" as thus determined, the taxpayer may be entitled to an allocated partial credit. See id. subparas. (3)(ii), (6), Example (1). This determination is made project by project. See id. subpara. (3)(iii).

The focus of the current dispute is whether Enercon retained "substantial rights" in the research it performed in fulfilling its contract with Vericor. As the regulation directs, we consider this question by examining the parties' contract. See Lockheed Martin Corp. v. United States, 210 F.3d 1366, 1376 (Fed. Cir. 2000) ("The regulation's focus on the taxpayer's right under the research agreements makes it clear that the determination whether the taxpayer had the right to use the results of its research without paying for that right must be determined by reference to the research agreements."), rev'g 42 Fed. Cl. 485 (1998); see also Fairchild Indus., Inc., 71 F.3d at 870 (stating that "the contractual arrangement" is the factor that determines which party is entitled to the credit).

C.    Analysis

The agreement governing the research appears in the Terms and Conditions that Vericor sent Enercon in February 2009. Enercon accepted these Terms and Conditions in its offer letter dated February 11, 2009. Paragraph 15 of that docu-

**[\*12]** ment, captioned "Designs, Drawings and Data," is the key provision for our purposes.

Paragraph 15(A) defines "Information" as a term of art. It says that "Information" means "any technical information" that (i) Vericor has supplied to Enercon; (ii) Enercon has designed at Vericor's expense; or (iii) Enercon has designed specifically to meet Vericor's technical requirements. Enercon agrees that, in consideration of Vericor's "furnishing of such Information and/or design funding," Enercon will not use (or assist others in using) "such Information, design funding, or tooling to develop or sell" Articles (or similar items) without Vericor's "prior written consent." "Articles" is elsewhere defined to mean the "goods and/or services being procured and described" in the purchase orders.

Paragraph 15(A) goes on to provide that Enercon "shall not use or disclose such Information" except in the performance of work for Vericor. Upon Vericor's request, "such Information and all copies thereof shall be returned" to Vericor. If Enercon should develop or sell Articles (or similar items) to anyone other than Vericor, the burden is on Enercon "to establish that * * * [Vericor's] Information, funding or tooling was not used."

These provisions are quite hostile to petitioners' claim that Enercon retained "substantial rights" in the research it performed for Vericor. Paragraph 15(A) ex-

**[\*13]** plicitly states that Enercon may not use or assist others in using, for the purpose of developing or selling Articles or similar items, "any technical information" that Enercon has designed at Vericor's expense or to meet Vericor's technical requirements. This prohibition is not limited to "technical information" but also includes "tooling" that Enercon develops in executing the contract.[5]

Conceivably, some research that Enercon performed might be useful in developing products other than Articles or similar items. But the latter half of Paragraph 15(A) includes a broader prohibition, stating that Enercon "shall not use * * * such Information except in the performance of Orders for Buyer, and, upon Buyer's request, such Information and all copies thereof shall be returned to Buyer." This text prevents Enercon, without Vericor's prior written consent, from using the results of its research for any purpose outside of Project No. 37688.

Paragraph 15(B) of the Terms and Conditions contains an additional prohibition. It provides that "Information prepared by Seller specifically in connection with performance of this Order, including original works of authorship created by Seller, are considered 'works made for hire' within the meaning of the U.S. Copy-

---

[5]The Terms and Conditions also bar Enercon from re-using any "design funding." The meaning of this phrase is not entirely clear: It could mean "payments for designs" under the contract or "designs that have been paid for" under the contract. On either interpretation this phrase is hostile to petitioners' claim that Enercon retained "substantial rights."

**[\*14]** right Laws" and that Vericor "shall be deemed the author of such works." This provision would appear to apply to such copyrightable materials as technical drawings, computer programs, databases, spreadsheets, reports, and manuals created by Enercon in fulfillment of its agreement with Vericor. See 11 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, secs. 703, 725, 922 (rev. ed. 2020). In the event any "Information prepared by * * * [Enercon] specifically in connection with [its] performance" is determined by a court not to be "a work made for hire," the purchase order "shall operate as an irrevocable assignment to * * * [Vericor] of all right, title and interest in and to such work."

The agreement governing the research thus provides that Enercon may not use, except in its performance of the contract for Vericor, "any technical information" or "tooling" developed for Vericor, and that any technical drawings or other copyrightable materials developed by Enercon belong to Vericor. All "Information" developed for Vericor and "all copies thereof" must be returned to Vericor at Vericor's request. Enercon in its offer letter recognized these restrictions, acknowledging that "[a]ll information, equipment, etc generated as a result of this order are owned by Vericor only."

That being so, it is hard to see what rights--much less what "substantial rights"--Enercon could be viewed as retaining in the research it performed. Rath-

**[\*15]** er, this is a situation where "the taxpayer perform[ed] research under an agreement that confer[red] on another person the exclusive right to exploit the results of the research." Sec. 1.41-4A(d)(2), Income Tax Regs. The taxpayer in these circumstances did "not perform[] qualified research because the research is treated as fully funded." Ibid.

D.    Petitioners' Arguments

Petitioners contend that Paragraph 15(A) of the Terms and Conditions simply sets forth "a standard non-disclosure agreement," preventing Enercon from disseminating the technical information and specifications that Vericor supplied to enable Enercon to execute the contract. But this interpretation ignores much of the relevant contract text. Subdivision (i) does define "Information" to include technical information "supplied to Seller by or on behalf of Buyer." But subdivisions (ii) and (iii) define this term also to include technical information that "Seller has designed at Buyer's expense" or that "Seller has designed specifically to meet Buyer-furnished technical requirements." And this paragraph covers more than technical information, barring Enercon from using "tooling" developed during the contract as well as "design funding." Paragraph 15(A) clearly covers the results of any research Enercon performs in the course of fulfilling the contract.

**[*16]** Petitioners characterize paragraph 15(B) of the Terms and Conditions as pertaining to rights "to any patents or copyrights that may arise out of the project," asserting that there is no evidence that "either party is claiming patent or other intellectual property rights." But Paragraph 15(B) makes no reference to patents, and it does not matter whether Vericor actually submitted copyright claims to the Copyright Office. We examine the parties' agreement to discern "the extent to which the research is funded." Sec. 1.41-4A(d)(1), Income Tax Regs. Paragraph 15(B) makes clear that Enercon retained no "substantial rights" to any technical drawings or other copyrightable material. And this text literally covers not just "original works of authorship," but any "Information prepared by Seller specifically in connection with performance" even if determined by a court not to be a "work made for hire."

Acknowledging that the agreement effects "an express transfer of some rights" to Vericor, petitioners urge that Enercon retained the right to use, on its own future projects, the "institutional knowledge it glean[ed] from research" performed for Vericor. But mere "[i]ncidental benefits * * * from performance of the research," such as having a more experienced or knowledgeable staff, do not constitute "substantial rights." Id. subpara. (2). And it does not help petitioners that Enercon could re-use the results of its research by getting Vericor's "prior written

[*17] consent." Having to secure permission to use the research, with no conditions limiting the other party's ability to withhold consent, prevents Enercon from possessing substantial rights. See Dynetics, Inc. & Subs. v. United States, 121 Fed. Cl. 492, 521 (2015) ("Dynetics does not address the obvious question of how it could have substantial rights in the results of the research, if it needed the government's 'authorization' to use those results.").

Finally, petitioners err in relying on Lockheed Martin Corp. v. United States, 210 F.3d 1366 (Fed. Cir. 2000), rev'g 42 Fed. Cl. 485 (1998). The Government in that case "concede[d] that the contract provisions g[a]ve * * * [the taxpayer] the right to use its research in its business." Id. at 1376. The Court of Federal Claims held that the taxpayer nevertheless did not retain "substantial rights" in the research because, under Federal export control laws referenced in the contracts, its functional ability to use the research results was considerably restricted. Lockheed Martin Corp., 42 Fed. Cl. at 492, 498.

The Federal Circuit reversed on that point, noting that these legal requirements were unrelated to the agreement the parties had executed. Lockheed Martin Corp., 210 F.3d at 1375-1376. The Federal Circuit thus held, as we hold here, that the parties' agreement controls in determining whether the taxpayer performing the research has retained "substantial rights." See sec. 1.41-4A(d)(1), Income Tax

**[*18]** Regs.  For the reasons stated above, the Terms and Conditions negotiated by Vericor and Enercon show that Enercon retained no such rights.

To reflect the foregoing,

<u>An order will be issued granting respondent's motion for partial summary judgment</u>.