[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11107
_____

D.C. Docket No. 9:12-cv-80334-DLB

GEOSYNTEC CONSULTANTS, INC.,

Plaintiff - Appellant,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 29, 2015)

Before WILSON and ROSENBAUM, Circuit Judges, and CONWAY,[*] District
Judge.

WILSON, Circuit Judge:

_____

[*] Honorable Anne C. Conway, Chief United States District Judge for the Middle District
of Florida, sitting by designation.

Plaintiff-appellant Geosyntec Consultants, Inc. (Geosyntec) appeals the district court's grant of summary judgment in favor of defendant-appellee United States of America (United States) and against Geosyntec, in which the district court found that Geosyntec was not entitled to research tax credits pursuant to 26 U.S.C. § 41 for research expenses incurred on certain client projects during tax years 2002 to 2005.

Under § 41, a taxpayer may claim a tax credit for increased spending on qualified research. Certain categories of research are expressly excluded from the definition of "qualified research." Specifically, under § 41(d)(4)(H), a taxpayer is precluded from claiming the research tax credit when otherwise qualifying research is "funded" by a third party. The district court found that research conducted by Geosyntec pursuant to two particular contracts was funded by Geosyntec's clients, making Geosyntec ineligible for the research tax credit for those contracts. On appeal, Geosyntec challenges the district court's categorization of those contracts as funded.

We are thus asked to consider whether the research performed by Geosyntec pursuant to the two contracts was funded by Geosyntec's clients (making Geosyntec ineligible for the research tax credit) or *not* funded (such that Geosyntec is entitled to claim the research tax credit). Although we have not previously had occasion to consider the applicability of § 41(d)(4)(H)'s funded research exclusion,

2

the Federal Circuit has, and the parties rely heavily on that court's seminal opinion. *See Fairchild Indus., Inc. v. United States*, 71 F.3d 868 (Fed. Cir. 1995), *modified* (Feb. 23, 1996).  Upon review, we conclude that the district court was correct in its interpretation of § 41 and affirm its entry of summary judgment against Geosyntec.

## I.

Geosyntec is a specialized consulting and engineering firm that contracts with clients, both public and private, to provide services on projects involving the environment, natural resources, and geological infrastructure.  It specializes in environmental studies and cleanup, infrastructure design and engineering, and natural resources assessment and restoration.  Geosyntec's stated business model is the development of innovative and sustainable solutions to environmental issues facing its clients.

In 2012, Geosyntec filed suit in the district court, seeking a federal income tax refund of $1,677,432 pursuant to 26 U.S.C. § 41—the research tax credit. Geosyntec alleged that it was entitled to research tax credits for qualified research expenses that it incurred on client projects in taxable years 2002, 2003, 2004, and 2005.  Geosyntec had previously sought a federal income tax refund from the Internal Revenue Service (IRS), which the IRS had disallowed.  In response to Geosyntec's district court action, the United States maintained its position that Geosyntec was not eligible for any tax refund under § 41.

3

Between 2002 and 2005, Geosyntec entered into hundreds of varied contracts with its clients. In the interest of efficiency, Geosyntec and the United States designated six representative contracts for the district court's review. Three of the contracts were fixed-price contracts, under which Geosyntec was paid a fixed total price for its work. The other three contracts were cost-plus contracts subject to a maximum, also known as "capped contracts," under which Geosyntec was paid for its labor and expenses, plus a mark-up, subject to an agreed-upon maximum price.

The parties further agreed on three key issues: (1) Geosyntec could not claim the research tax credit if a third party had "funded" the otherwise qualified research; (2) Geosyntec's existing client contracts governed determination of the funding issue and, there being no factual disputes as to those contracts, expert testimony would be unnecessary; and (3) if the district court determined Geosyntec's research was funded, the United States was entitled to judgment in its favor. A finding that Geosyntec's research was *not* funded, however, would necessitate further litigation on additional fact-intensive issues related to Geosyntec's right to the research tax credit.

Given the parties' stipulations and on the parties' joint motion, the district court authorized summary judgment briefing on the threshold matter of whether research performed by Geosyntec under the representative fixed-priced and capped

4

contracts was funded within the meaning of § 41.  The parties filed cross-motions for summary judgment on the funding issue.

On April 17, 2013, the district court entered an order granting each party's motion for summary judgment in part and denying each in part.  As to the three capped contracts, the district court agreed with the United States and found those contracts funded, making Geosyntec ineligible for the research tax credit for research expenses incurred under the capped contracts.  As to the three fixed-price contracts, the district court agreed with Geosyntec and found that those contracts were not funded.  Therefore, Geosyntec remained eligible for the research tax credit for qualifying research expenses it incurred under the fixed-price contracts.

Because Geosyntec remained eligible for the research tax credit as to the fixed-price contracts, further litigation would be necessary to determine whether Geosyntec was, in fact, entitled to the research tax credit.  However, in lieu of further litigation, the parties entered into a settlement agreement.  Pursuant to the parties' settlement, the district court entered an agreed-upon judgment that, among other things, (a) allowed Geosyntec a federal income tax refund totaling $255,575, plus statutory interest, for the unfunded fixed-price contracts; (b) denied a refund

5

for the funded capped contracts; and (c) preserved Geosyntec's right to appeal the district court's ruling as to the capped contracts. This appeal followed.[1]

## II.

We review a district court's order granting summary judgment de novo, applying the same legal standards as those applied by the district court.[2] *See Thrasher v. State Farm Fire & Cas. Co.*, 734 F.2d 637, 638 (11th Cir. 1984) (per curiam). To this end, we view the evidence and make all reasonable inferences in favor of the non-moving party. *See Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999) (per curiam). Summary judgment is properly granted only where there exists "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *See Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994) (citing Fed. R. Civ. P. 56(c)).

## III.

Geosyntec contends that the district court erred in finding that the three capped contracts were funded and that Geosyntec was thus ineligible for the research tax credit as to research expenses incurred under those contracts. While

---

[1] The United States did not appeal the district court's partial denial of its motion for summary judgment.

[2] To the extent that Geosyntec's appeal is a more narrow challenge to the district court's reading of the applicable statutes and regulations or its interpretation of the contracts at issue, our standard of review remains the same, as both statutory and contractual interpretation present questions of law that we review de novo. *See Tobin v. Mich. Mut. Ins. Co.*, 398 F.3d 1267, 1274 (11th Cir. 2005) (per curiam).

three capped contracts were before the district court, Geosyntec appeals the district

court's summary judgment ruling as to only two: (1) a contract with the Delaware

Solid Waste Authority (DSWA) to expand the capacity of the Cherry Island

Landfill in Wilmington, Delaware (the Cherry Island Contract); and (2) a contract

with Waste Management, Inc. (WM) to evaluate technology for remediating

groundwater beneath a warehouse in Niagara, New York (the WM Contract).[3]

After consideration of the applicable statute and regulations, the district

court found that both the Cherry Island Contract and the WM Contract were

funded within the meaning of § 41 and Geosyntec was therefore not entitled to

claim the research tax credit for research conducted pursuant to those contracts.

Geosyntec agrees with the district court's invocation of the standard articulated in

*Fairchild*, 71 F.3d at 873, that the funded research inquiry "turns on who bears the

research costs upon failure" of the research; but it challenges the district court's

application of that standard to the Cherry Island and WM Contracts.  According to

Geosyntec, both of those contracts place the costs of research failure "squarely" on

Geosyntec, and it is thus eligible for the research tax credit.  The United States

disagrees.  On de novo review, we find that the district court correctly applied § 41

---

[3] As set forth above, the district court found all three of the capped contracts before it
funded for purposes of the research tax credit.  However, on appeal, Geosyntec challenges the
district court's order as to only two of those contracts; it does not appeal the district court's order
as to the third capped contract between Geosyntec and Pneumo Abex Corporation.  Any
challenge to the district court's characterization of that contract as funded is deemed abandoned.
*See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (issues not briefed
on appeal are abandoned).

and its implementing regulations to the Cherry Island Contract and to the WM
Contract.

## A.

Our analysis begins with an examination of the language of the statute and
its overarching purpose. The research tax credit was enacted as part of the
Economic Recovery Tax Act of 1981[4] to incentivize American industry to invest in
research. *See id.* at 870, 874. "[D]esigned to divert additional resources to
research by reducing the cost of that additional research," *id.* at 874, its importance
is evidenced by Congress' repeated extension of the credit since its inception, *see,
e.g.*, H.R. Conf. Rep. No. 100-1104, pt. 2, at 78 (1988) ("[E]ffective tax incentives
for research and development must be a fundamental element of America's
competitiveness strategy."). Still, as with all tax credits, taxpayers who claim the
research tax credit bear the burden of establishing their entitlement to it. *See
MedChem (P.R.), Inc. v. Comm'r*, 295 F.3d 118, 123 (1st Cir. 2002).

Under § 41, a taxpayer may claim a twenty-percent tax credit for the amount
of "qualified research expenses" paid or incurred in the performance of "qualified
research" that exceed a statutorily defined base amount. Qualified research
expenses mean and refer to in-house and contract research expenses paid or

---

[4] Pub. L. No. 97-34, § 221(a), 95 Stat. 241 (originally codified at 26 U.S.C. § 44F). The
research tax credit was redesignated as § 30 by the Deficit Reduction Act of 1984, Pub. L. 98-
369, §§ 471(c), 474(i)(1), 98 Stat. 826, 831, 912. The current version of the research tax credit is
found at § 41. *See* Tax Reform Act of 1986, Pub. L. 99-514, § 231, 100 Stat. 2173–80, 2856
(amending research tax credit and renumbering section as § 41).

incurred by the taxpayer during the taxable year. *See* § 41(b)(1). Research is qualified if: (a) it is an expenditure that may be treated as an expense under § 174;[5] (b) it is undertaken to discover technological information "intended to be useful in the development of a new or improved business component of the taxpayer"; and (c) it includes activities that constitute elements of a process of experimentation for a statutorily defined purpose. *See id.* § 41(d)(1).

There are seven categories of research expressly excluded from the definition of "qualified research." *See id.* § 41(d)(4)(A)–(H). For purposes of this appeal, we are concerned only with the seventh category of exclusion—the funded research exclusion—which excludes "[a]ny research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity)." *Id.* § 41(d)(4)(H). The Code does not define "funded" as the term is used in § 41; however, the implementing regulations do set forth criteria as to what research qualifies as "funded" and who, if anyone, is eligible to claim the research tax credit for amounts paid or incurred pursuant to a contract for research (i.e., the researcher or the client).

---

[5] Section 174 provides the standard by which "[a] taxpayer may treat research or experimental expenditures" as expenses. Whether the amounts incurred by Geosyntec under the Cherry Island and WM Contracts qualify as "expenses" is not at issue.

9

"To determine the extent to which research is funded," we are directed to

Treasury Regulation § 1.41-4A(d),[6] which provides, in relevant part:

> Research does not constitute qualified research to the extent it is funded by any grant, contract, or otherwise by another person (including any governmental entity).  All agreements (not only research contracts) entered into between the taxpayer performing the research and other persons shall be considered in determining the extent to which the research is funded.  *Amounts payable under any agreement that are contingent on the success of the research and thus considered to be paid for the product or result of the research* (see § 1.41-2(e)(2)) *are not treated as funding*.

26 C.F.R. § 1.41-4A(d) (emphasis added).[7]  Referring to "the taxpayer performing

the research," § 1.41-4A(d) addresses eligibility for § 41's research tax credit from

the researcher's perspective.  Placing the emphasis on agreements between the

researcher and its client, this regulation provides that research is *not* considered

funded where an agreement makes payment to the researcher "contingent on the

success of [its] research."  *See id.*

---

[6] *See* 26 C.F.R. § 1.41-4(c)(9) ("Qualified research does not include any research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity). To determine the extent to which research is so funded, § 1.41–4A(d) applies.").

[7] Section 1.41-4A(d) contemplates a second scenario in which research is funded; that is, where the researcher agrees to perform research for another person or entity without retaining "substantial rights" in the research.  *See* § 1.41-4A(d)(2)–(3).  By stipulation, the parties deferred the issue of whether Geosyntec retained substantial rights in its research at least in part because Geosyntec's retained rights varied among its contracts and the issue did not lend itself to summary judgment.  The parties further stipulated that, if the research was "funded," as the term is defined at § 1.41-4A(d)(1), judgment would be entered in favor of the United States regardless of whether Geosyntec retained substantial rights in its research.  As such, the district court did not address the matter in deciding on the cross-motions, and it is not at issue on appeal.

10

Treasury Regulation § 1.41-2(e), in turn, governs the client's ability to claim funds expended on qualified research as credit-eligible research expenses under § 41. To be an expense paid or incurred by the client, the research *must* be performed on behalf of the client and the client *must* "bear the expense [of the research] even if the research is not successful." *Id.* § 1.41-2(e)(2)(iii). The reason is clear: "If an expense is paid or incurred pursuant to an agreement under which payment is contingent on the success of the research, then the expense is considered paid for the product or result rather than the performance of the research," and the tax credit is meant to incentivize research not production. *Id.*; *see* H.R. Rep. No. 100-1104, vol. 2, at 78. Therefore, the client cannot claim the payment as a credit-eligible contract research expense.[8] *See* § 1.41-2(e).

Together, the regulations present "mirror image rules" for determining who is entitled to claim the research tax credit under § 41—the researcher or the researcher's client. *Fairchild*, 71 F.3d at 870 (internal quotation marks omitted). The regulations allocate the research tax credit to the entity or person that bears "the financial risk of failure of the research to produce the desired product or result." *Id.* As such, the client "may claim the credit only if the agreement requires the [client] to pay for the research even if it is unsuccessful." *Id.*; *see* § 1.41-2(e)(2). If, on the other hand, the client "need not pay unless the research is

---

[8] Under § 1.41-2(e), where only a portion of a payment is contingent on success, a client may claim the research tax credit as to those amounts that are *not* contingent on success.

11

successful," the client is paying for a product or result rather than performance of the research, and the researcher is eligible to claim the research tax credit because the research is not funded.  *Fairchild*, 71 F.3d at 870; *see* § 1.41-4A(d).

Therefore, under § 41 and its implementing regulations, our inquiry turns on whether Geosyntec's right to payment under its separate contracts with DSWA and with WM was "contingent on the success of the research" contemplated by those contracts.  *See* § 1.41-4A(d); *see also Fairchild*, 71 F.3d at 870, 872.

## B.

Given the contract-centric nature of our review, we look next to the terms of the two contracts at issue, examining each in turn.  *See Fairchild*, 71 F.3d at 870 (citing § 1.41-2(e)(2)) ("[T]he contractual arrangement is the factor that determines who is entitled to the tax benefit . . . ."); § 1.41-4A(d) (requiring consideration of all agreements between taxpayer performing research and other persons).

### 1.    The Cherry Island Contract

In 2001, Geosyntec contracted with DSWA to design a method for expanding the Cherry Island Landfill in Wilmington, Delaware.  The goal was to increase the capacity of the landfill within its existing footprint.  The landfill sat on a soft foundation, which limited its capacity for vertical expansion, but a previously-commissioned composite stability analysis of the landfill demonstrated

12

that expansion was possible.  Geosyntec ultimately designed a berm wall and drainage system that allowed for the vertical expansion sought by DSWA.

The Cherry Island Contract was composed of an engineering services agreement and five exhibits, including a detailed scope of work, a project schedule with a list of meetings and deliverables, a project budget, a statement of the manner and times of payment, and a hold-harmless agreement.  Geosyntec's work was separated into seven general tasks: (1) site studies; (2) design work, including site design; (3) general services, including permit applications and construction drawings; (4) preparation of an operation and maintenance manual; (5) construction-related services, including on-site supervision and quality assurance monitoring; (6) post-construction services, including as-built drawings and a project completion report; and (7) additional analyses, modeling, and testing.  Each task included several subtasks.

DSWA agreed to pay Geosyntec "on a cost reimbursement basis . . . in an amount not to exceed $9,991,578."  Each subtask was separately priced and payment to Geosyntec for each subtask was not to exceed the amount specified therefor.  However, additional compensation was available to Geosyntec in stated circumstances.  For example, where statutory or administrative requirements necessitated additional work by Geosyntec, it was entitled to "an equitable adjustment of its compensation."  Similarly, if the state's environmental authorities

13

imposed "unreasonable demands" related to the issuance of any permit, which demands required Geosyntec to perform work that would not otherwise be required, Geosyntec was entitled to "extra compensation" for such work in an amount to be determined by the parties. Geosyntec was entitled to additional compensation where mandatory public hearings and meetings on the project resulted in costs above the applicable subtask total, and it also reserved the right to change the hourly rate for work performed during the construction and final phases of the project (Tasks 5 and 7) subject to certain conditions.

Geosyntec was required to submit to DSWA one "approvable invoice" per month for services rendered under the Cherry Island Contract; prior to submission, the invoices were to be verified by project managers for both Geosyntec and DSWA. DSWA was obligated to pay "only those sums invoiced for Work that [it] approved for payment." Where DSWA disputed any sums shown on the invoice, it could withhold payment of the disputed amount. Within three days of completion of all services required under the Cherry Island Contract, Geosyntec had to submit a notice of completion to DSWA, which, in turn, had thirty days to provide to Geosyntec a list of any incomplete services.

All services to be provided by Geosyntec under the Cherry Island Contract were to be performed "in accordance with the standard of care applicable to such services on the type of Project" contemplated by the contract. Elsewhere in the

14

contract, Geosyntec warranted that it would perform in accordance with the standards applicable to similar engineering professionals performing services of a similar nature. Omissions and ambiguities in Geosyntec's plans, specifications, and reports were to be corrected by Geosyntec at no additional cost to DSWA; Geosyntec was also permitted to remedy any errors or omissions in its work through "reperformance" of the work at its own expense in a timely fashion.

The Cherry Island Contract affirmatively required that Geosyntec's work comply with all current and future federal, state, and local laws and regulations as well as with DSWA's existing permits for the landfill. Geosyntec was obligated to complete certain of its work to the satisfaction of Delaware's Department of Natural Resources and Environmental Control (DNREC)[9] and to perform "whatever work" was required by DNREC's "Regulations Governing Solid Waste." Specified subtasks also required Geosyntec to provide its work to DSWA and/or DNREC for their review and for discussion and comment where necessary. DSWA could terminate the contract for default or for its own convenience.

---

[9] Under the Cherry Island Contract, Geosyntec was tasked with obtaining the required construction and operation permits from DNREC and the City of Wilmington, and the parties acknowledged that "to obtain the permits [Geosyntec] must satisfy the [permit] requirements to the satisfaction of DNREC or the City of Wilmington." In addition, the Cherry Island Contact required the "DSWA [to] maintain close contact with DNREC and [to] update DNREC on the design status to facilitate permit review and approval."

15

## 2.    The WM Contract

In 1997, WM and Geosyntec entered into a master services agreement whereby Geosyntec agreed to provide engineering consulting services on future projects as described in project-specific addenda.  Each addendum would include a standard WM addendum form and a statement of work by Geosyntec.  Pursuant to one such addendum, executed by the parties in 2003, Geosyntec was hired to evaluate a system for remediating contaminated groundwater beneath a warehouse site previously used to manufacture and store weapons and radioactive material.

Pursuant to the WM Contract,[10] Geosyntec was to (1) perform laboratory bench tests to evaluate the feasibility and performance of enhanced in situ bioremediation (EISB) for groundwater cleanup and (2) prepare a report describing its methodology, tabulating the results, interpreting the data collected, and discussing site conditions and potential pilot-test designs.  The addendum capped the contract price at $18,781 in accordance with Geosyntec's estimated budget for the project.  A statement of work, with Geosyntec's objectives, technical approach, and scope of work, as well as an estimated budget, including projected labor and material costs, were attached to the addendum.  All necessary work and services were to be completed by October 31, 2003.

---

[10] The WM Contract is comprised of both the master services agreement and the 2003 addendum.

16

The WM Contract required payment to Geosyntec "upon proper performance of each task" at fixed unit prices as set forth in Geosyntec's estimated budget.  Geosyntec was required to submit monthly progress invoices, and WM had forty-five days within which to pay all undisputed amounts therein.  WM could dispute any item in invoices submitted by Geosyntec for "any reason, including the lack of supporting documentation or suspected defective or negligently performed work."  In such an instance, WM was required to promptly notify Geosyntec of the dispute and to request clarification or remedial action as to the item; where disputes were settled in Geosyntec's favor, WM was to include payment for the settled amount in a subsequent payment to Geosyntec.

The contract gave WM the right to change, make additions to, or omit work required under the WM Contract by sending "a written change directive" to Geosyntec.  Geosyntec was to perform or omit such changed work as directed; however, if any change necessitated an increase in the capped contract price, Geosyntec was to promptly notify WM of the increase.  Geosyntec was not to proceed with the changed work unless and until the parties executed an addendum adjusting the contract price.  The WM Contract also gave WM the right to terminate the contract for default or on five days' notice for any reason.  Geosyntec, in turn, could terminate the WM Contract on ninety days' notice for any reason.

17

Geosyntec was responsible for performing its work "in accordance with the degree of professional care, prudence and skill of a nationally recognized, properly licensed, professional engineering firm in performing comparable services." The WM Contract further required that Geosyntec's work be free from negligence. WM had a right to review and approve, reject, or approve with comment any work provided by Geosyntec, and any remedial work deemed necessary by WM was to be performed in part or entirely by either Geosyntec or WM. Geosyntec was accountable for costs, damages, and expenses resulting from errors, defects, or negligent acts or omissions in its work.

## C.

Applying the above-stated legal principles to the two contracts at issue, the matter to be determined is whether payment to Geosyntec under the Cherry Island Contract or under the WM Contract, or both, was contingent on Geosyntec's performance. *See Fairchild*, 71 F.3d at 872. If Geosyntec was entitled to payment under both or either contract regardless of the success of its research, it is *not* eligible to claim the research tax credit; conversely, if payment to Geosyntec under both or either contract was contingent on Geosyntec's successful research or development of a product or process, Geosyntec *is* eligible to claim the research tax credit. *See* §§ 1.41-2(e), 1.41-4A(d). The parties' benchmark is the fixed-price incentive contract discussed in *Fairchild*.

18

In *Fairchild*, an airplane manufacturer, Fairchild, contracted with the United States Air Force to design and produce the T-46A aircraft. *See Fairchild*, 71 F.3d at 870. The contract included a full-scale development (FSD) phase and a production phase, but the case focused solely on the FSD phase. *Id.* Fairchild's work in the FSD phase was subdivided into eleven separately-priced contract line items, and each line item required "research, development, and testing, to meet complex contract specifications." *Id.* at 871, 873. The *Fairchild* contract contained over 1,000 pages of technical specifications requiring Fairchild to meet specific design, construction, quality, and performance standards. *Id.* at 870.

Under the terms of the contract, the Air Force was obligated to pay Fairchild only if Fairchild produced results that met the contract's specifications; equally, Fairchild was entitled to payment only for work delivered to and accepted by the Air Force. *See id.* at 871. "Quality assurance procedures" required the Air Force to evaluate Fairchild's work item-by-item. *See id.* If Fairchild's work was delivered and deemed unacceptable, the Air Force could reject the work, make Fairchild correct the work at its own expense, or accept the work and pay a reduced price. *Id.* Examining the contract, the Federal Circuit concluded that "[w]hatever risk Fairchild was bearing, the Air Force bore none of it" because the Air Force only had to pay when the work, "line item by line item, succeeded and was accepted." *Id.* at 873. Since Fairchild bore the financial risk of failed

19

research, the contract was *not* funded, making Fairchild eligible for the research tax credit.[11]  *See id.* at 874.

Here, Geosyntec avers that the Cherry Island Contract and the WM Contract fall squarely within the gambit of *Fairchild*.  Geosyntec contends that it faced substantial financial risk under the capped contracts because it would only be paid for expenses incurred, eliminating an opportunity to make a profit on the research should it come in under budget, and it bore the risk that its expenses would exceed the ceiling price for each contract.  Geosyntec further argues that the totality of the provisions contained in both the Cherry Island Contract and the WM Contract allocated to Geosyntec the financial risk of the failure of its research to produce the desired product or result—even if success was not expressly mandated by the terms of either contract.  *See id.* at 870.  Despite Geosyntec's arguments to the contrary, we find that both the Cherry Island Contract and the WM Contract were "funded" as that term is used in § 41 and Treasury Regulation § 1.41-4A(d).

First, Geosyntec's general economic risk arguments are misplaced. Geosyntec argues that it faced substantial financial risk under the capped contracts because its compensation was fixed.  More specifically, Geosyntec avers that it ran the risk of not receiving the full ceiling price or, conversely, of exceeding its own

---

[11] In *Fairchild*, the parties agreed that Fairchild retained substantial rights in its research. As such, the Federal Circuit was only concerned with "whether payment [to Fairchild] was contingent on success." *Fairchild*, 71 F.3d at 872.

budget.  However, these cost-of-performance arguments focus on the amount Geosyntec would be paid and/or the likelihood that its contracts would be profitable, which is of no matter here.  Cost-of-performance is not the financial risk with which we are concerned because "the only issue is whether payment was contingent on the success of the research"—that is, the financial risk of failure. *See id.* at 872.

Moreover, additional compensation was available in certain circumstances. Geosyntec could submit a claim for additional compensation for necessary work that fell outside the scope of the services contemplated by the Cherry Island Contract.  Geosyntec was also entitled to extra compensation where Delaware's environmental authorities imposed "unreasonable demands" that required additional work or services, and it reserved the right to change the hourly rate for work performed during two separate phases (subject to stated conditions).  In the WM Contract, if WM changed the work required under the contract, the parties would agree on a price increase and/or time extension necessary for Geosyntec to complete the additional work.  In short, contrary to Geosyntec's arguments, the capped contracts' not-to-exceed ceiling prices were not immovable.

Second, neither the Cherry Island Contract nor the WM Contract expressly made payment to Geosyntec contingent on the success of Geosyntec's research. Fairchild, for example, *had* to succeed at each step of the FSD phase in order to be

21

paid; those were the terms of Fairchild's contract with the Air Force. *See* 71 F.3d at 873. In fact, the *Fairchild* contract provided that Fairchild was without any right to retain progress payments made to Fairchild by the Air Force during the course of Fairchild's performance if the contract line items to which the payments applied were not delivered *and* accepted. *See id.* at 871. Here, DSWA and WM were contractually obligated to pay for Geosyntec's research and work product even if it did not produce the desired outcome.

Looking first at the WM Contract, it required Geosyntec to perform laboratory bench tests and to provide WM with a brief study report. Data from the study would be used to determine the cost-effectiveness and feasibility of implementing EISB, and, if appropriate, to design a field-scale implementation. However, if Geosyntec's laboratory bench tests were performed in accordance with all applicable professional standards, *but* the tests established that EISB was not a feasible process for accelerating groundwater cleanup, WM remained contractually obligated to pay Geosyntec for the labor and material used in conducting the treatability test and preparing the report thereon. WM contracted for and agreed to pay Geosyntec for its research, not for a result.

As to the Cherry Island Contract, Geosyntec was asked to design an expansion of the Cherry Island Landfill and provide support services during construction. Like the *Fairchild* contract, each of the tasks required research,

22

development, and testing.  However, unlike the *Fairchild* contract, the project did

not require installation and integration of specific elements; each task was not

subject to complex contract specifications; and Geosyntec's work was not subject

to inspection and testing before acceptance.  *Cf. id.* at 871, 873.  Rather, the design

was left almost entirely to Geosyntec's professional expertise, informed by

Geosyntec's own research and subject to general (and, at times, passive)

requirements.[12]  Further, while DSWA had the right to review and comment on

certain of Geosyntec's design work, there was no method for its rejection.

Third, the totality of the provisions in the Cherry Island Contract and in the

WM Contract did not place the risk of failed research on Geosyntec.  *See id.* at 870

(stating that tax credit is allocated to person that bears financial risk of failure of

the research).  Given that neither the Cherry Island Contract nor the WM Contract

expressly mandates a successful outcome (either in total or in each phase of the

particular projects), Geosyntec interprets the contracts' provisions as collectively

placing the risk of failure of the research on Geosyntec.  To this end, Geosyntec

---

[12] In discussing the performance requirements to which it was held, Geosyntec repeatedly refers to language in the Cherry Island Contract requiring that Geosyntec's work be completed "to the satisfaction of DNREC."  For one thing, DNREC was not a party to the Cherry Island Contract.  *See Fairchild*, 71 F.3d at 870 (stating the contractual arrangement between the researcher and the client determines who is entitled to the tax credit).  Further, part of Geosyntec's contractual obligation was to obtain the necessary permits from DNREC and the City of Wilmington.  To this end, the Cherry Island Contract acknowledges "that DNREC and the City of Wilmington interpret their permit requirements, and that to obtain the permits [Geosyntec] must satisfy the requirements to the satisfaction of DNREC or the City of Wilmington."  The language to which Geosyntec refers does not evidence a quality assurance procedure akin to that in *Fairchild*; rather, it denotes which tasks had to be completed subject to DNREC's or the City of Wilmington's requirements in order to obtain the necessary permits.

23

contends it was subject to certain performance requirements and quality assurance procedures that allocated "unsatisfactory-performance risk" to Geosyntec. Geosyntec also relies heavily on the invoice procedures contained in each contract as evidence of the "strong client-rejection rights" to which it was subject. Geosyntec's arguments are not persuasive.

In the first place, Geosyntec's argument that it was subject to performance requirements that allocated the risk of failure to Geosyntec is unavailing. Both the Cherry Island Contract and the WM Contract required Geosyntec to perform in accordance with the standard of care applicable to like professionals performing comparable services on the type of project contemplated by the each of the contracts; Geosyntec's work was to be free from negligence, error, and defects. We are not concerned, however, with the general standard of care applicable to Geosyntec or Geosyntec's uniform assurances that its performance would be free from negligence; those provisions do not mandate success. Indeed, neither contract equates "proper performance" with "successful performance."[13]

Further, under neither contract was Geosyntec subject to quality assurance procedures akin to those in *Fairchild. See, e.g., id.* at 873 (noting contract made all work subject to inspection and testing prior to acceptance and provided that

---

[13] *See Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) ("[W]here the language is plain a court should not create confusion by adding hidden meanings, terms, conditions, or unexpressed intentions." (citations omitted)).

payment would be made only after acceptance).  Contrary to the *Fairchild*

contract, the WM Contract did not have an extensive list of deliverables; it

required only that all services be completed by a specified date.  While the WM

Contract granted to WM a general right to inspect any work provided by

Geosyntec thereunder, WM's approval and acceptance was not mandated.  *Cf. id.*

at 871, 873.  The provision is passive, and WM's "right of approval" is not

informed by and does not inform Geosyntec's right to payment.[14]

Under the Cherry Island Contract, Geosyntec was required to submit certain

of its work to DSWA for review, comment, and discussion.  In the design phase,

design plans and specifications were submitted to DSWA for review at 30%, 65%,

85%, 95%, and 100% completion; at 30% completion, the Cherry Island Contract

required DSWA's review and approval of the site design.  Still, even in this

instance, the WM Contract provided that Geosyntec need only incorporate

DSWA's "comments" to the extent deemed "desirable" by Geosyntec.  The Cherry

Island Contract provided no barometer by which Geosyntec's performance could

be considered "successful," and there existed no mechanism for evaluation and

acceptance or rejection of the delivered design.  *Cf. id.* at 871.

Finally, Geosyntec's argument that the two capped contracts provide for

"strong client rejection rights" such that it was only entitled to payment for work

---

[14] *See Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014) (noting the terms of a contract must be interpreted in the context of the entire contract).

delivered to and accepted by DSWA or by WM is similarly unpersuasive. According to Geosyntec, because DSWA and WM could dispute sums included on invoices submitted by Geosyntec, it had "no legal right" to payment unless it could demonstrate its work was satisfactory. Geosyntec likens its clients' right to dispute invoiced sums to the Air Force's right to inspect and reject Fairchild's work product in *Fairchild*. A review of the invoice procedures in the Cherry Island and WM Contracts dampens Geosyntec's comparison.

In *Fairchild*, the contract between Fairchild and the Air Force included "quality assurance procedures" whereby the Air Force would inspect, test, and approve or reject Fairchild's work product. *See id.* at 871, 873. Unless and until Fairchild "fully succeeded in each phase of the project," it had no right to payment, and, if the Air Force deemed the work unacceptable, Fairchild ran the risk of nonpayment. *Id.* Monthly invoices submitted by Geosyntec to DSWA and to WM, on the other hand, were payable upon submission unless an item or sum shown due on the invoice was in dispute.

Under the WM Contract, for example, Geosyntec was required to submit monthly progress invoices for all work performed during the previous calendar month. The master agreement provided that payment was due upon "proper performance of each task." WM could dispute items in submitted invoices for any reason, including Geosyntec's failure to accurately account for its work or where

26

WM suspected the work was "defective or negligently performed." However, the item was only temporarily deleted and, once the dispute was settled, WM was obligated to pay the invoiced amount.

Similarly, the Cherry Island Contract required Geosyntec to submit monthly, "approvable" invoices for services rendered. Each invoice was to be verified by representatives of both DSWA and Geosyntec, and DSWA was required to pay Geosyntec "only those sums invoiced for Work that [was] approved for payment by DSWA." All of the work contemplated under the Cherry Island Contract was set forth in the scope of work attached thereto, and the pay rate for each "item of work" was pre-determined by the project budget. The Cherry Island Contract did not provide for DSWA's review and approval of Geosyntec's work product prior to payment, but it did require Geosyntec to obtain DSWA's written approval before performing any work outside the contemplated scope of services. As such, unless the work performed was set forth in the scope of work or DSWA gave written permission for performance of the work, DSWA was not required to pay Geosyntec therefor and could dispute the sum.

Under neither contract does the right to dispute sums shown due on an invoice equate to a requirement that Geosyntec's work product be evaluated and accepted prior to payment. While the Cherry Island Contract included a two-page list of deliverables, Geosyntec was not paid on delivery and acceptance of those

27

items and was not required to deliver results that met contract specifications prior to payment.  Rather, Geosyntec was paid upon submission of an approvable invoice.  Similarly, under the WM Contract, Geosyntec was not entitled to payment only if the study report was delivered and accepted.  Instead, Geosyntec was paid for all work performed during the previous calendar month.  Any risk of nonpayment borne by Geosyntec was unrelated to the outcome of its research.

In sum, Geosyntec was entitled to payment under both the Cherry Island Contract and the WM Contract regardless of success.  *See* 26 C.F.R. §§ 1.41-2(e), 1.41-4A(d).  Both DSWA and WM contracted with Geosyntec to reimburse Geosyntec for labor and costs for pre-defined tasks at pre-defined rates.  Neither the Cherry Island Contract nor the WM Contract provided that DSWA or WM was obligated to reimburse Geosyntec only if Geosyntec produced results that met the contracts' specifications.  *Cf. Fairchild*, 71 F.3d at 871.  Similarly, Geosyntec was not "entitled to payment only for work product delivered [to] and accepted" by its clients.  *Id.*  Because payment to Geosyntec was not contingent on the success of its research, Geosyntec did not bear the financial risk of its own failure, and the two capped contracts were funded by Geosyntec's clients.  *See id.* at 872; *see also* § 1.41-4A(d).

## IV.

As Geosyntec acknowledged at oral argument, the success or failure of its appeal lay in the terms of the two capped contracts.  Upon a careful review of both contracts, we agree with the district court that both the Cherry Island Contract and the WM Contract are funded, as that term is used in § 41 and the implementing regulations, and Geosyntec is not eligible for research tax credits for research expenses incurred under those contracts.[15]  Therefore, the district court's grant of summary judgment is AFFIRMED.

---

[15] *See Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1277 (11th Cir. 2001) ("A grant of summary judgment may be upheld on any basis supported by the record.").