# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 13, 2023

Lyle W. Cayce
Clerk

No. 22-30764

---

United States of America,

*Plaintiff—Appellee*,

*versus*

Leonard L. Grigsby; Barbara F. Grigsby,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:19-CV-596

---

Before Higginbotham, Smith, and Elrod, *Circuit Judges*.

Patrick E. Higginbotham, *Circuit Judge*:

Today, we visit the classic congressional practice of using its taxing powers to achieve permissible policy goals; here, the lure of a tax credit to incentivize creative research. Leonard L. Grigsby and Barbara F. Grigsby appeal the judgment of the United States District Court for the Middle District of Louisiana which rejected research and development tax credits claimed by Cajun Industries LLC and upheld the resulting tax deficiency.

We AFFIRM.

No. 22-30764

## I.

Cajun Industries LLC ("Cajun") claimed tax credits for the 2013 tax year pursuant to § 41 of the Internal Revenue Code, 26 U.S.C. § 41. First, the Code provision at issue in this case, § 41 offers a tax credit for "qualified research expenses" including wages and expenditures incurred in pursuit of qualified research.[1]

The Internal Revenue Code provides a tax credit for qualified research activities, as defined by the Code.[2] To constitute "qualified research," the research must satisfy the four tests laid out in § 41(d)(1): "(1) the expense must be of the type deductible under § 174 of the Code (i.e., R & D expenses that are reasonable under the circumstances), (2) the research must be undertaken for the purposes of discovering information that is 'technological in nature,' (3) the information must be 'intended to be useful in the development of a new or improved business component of the taxpayer,' and (4) 'substantially all of the activities [must] constitute elements of a process of experimentation.'"[3] Relevant here, "business

---

[1] 26 U.S.C. § 41(b).

[2] *See generally id.*

[3] *Shami v. Comm'r,* 741 F.3d 560, 563 (5th Cir. 2014) (citing 26 U.S.C. § 41(d)(1)). The full text of 26 U.S.C. § 41(d)(1) reads:
> (d) Qualified research defined.--For purposes of this section--
> (1) In general.--The term "qualified research" means research--
> (A) with respect to which expenditures may be treated as specified research or experimental expenditures under section 174,
> (B) which is undertaken for the purpose of discovering information--
>> (i) which is technological in nature, and
>> (ii) the application of which is intended to be useful in the development of a new or improved business component of the taxpayer, and
> (C) substantially all of the activities of which constitute elements of a process of experimentation for a purpose described in paragraph (3).
> Such term does not include any activity described in paragraph (4).

2

No. 22-30764

components" are defined as "any product, process, computer software, technique, formula, or invention which is to be (i) held for sale, lease, or license, or (ii) used by the taxpayer in a trade or business of the taxpayer."[4]

However, qualified research expressly excludes so-called "funded" research.[5] Funded research include "any research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity)."[6] Treasury Regulations further explain that research is funded if, in any agreement to perform research (1) the researcher retains no substantial rights to their research; or (2) payment is not contingent upon the research's success.[7]

## A. Claimed Credits

Cajun provides construction services throughout the Gulf Coast Region and engaged in over one hundred construction projects during the time period in question. In 2015, Cajun hired a consulting firm to evaluate its projects and advise whether Cajun was eligible for research credits under § 41. Based on the firm's report, Cajun, believing it was entitled to a $1,341,420 research credit, filed an amended Form 1120S for the 2013 tax year claiming the $1,341,420 credit.

---

26 U.S.C. § 41(d)(1).

[4] *Id*. § 41(d)(2)(B).

[5] *Id* § 41(d)(4)(H) ("(4) Activities for which credit not allowed. --The term 'qualified research' shall not include any of the following . . . (H) Funded research.--Any research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity).").

[6] *Id*.

[7] 26 C.F.R. § 1.41-4A(d).

As an S-Corporation, Cajun's income, losses, deductions, and credits pass through to its shareholders for income tax purposes. At all relevant times, Appellant Leonard Grigsby owned a 73% interest in Cajun and was thus entitled to a *pro rata* allocation of Cajun's tax credit, which amounted to $979,237. The $979,237 credit reduced Mr. and Mrs. Grigsby's tax liability for 2013 and indicated the couple overpaid their federal income taxes by $576,756. Appellants filed an amended 2013 tax return and sought a refund of $576,756 plus statutory overpayment interest in the amount of $73,633.38 (the "Contested Refund"). On September 15, 2017, the Internal Revenue Service ("IRS") issued Appellants a refund of $671,071.38, comprised of the Contested Refund and an additional $20,652 not at issue in this case.[8]

However, on August 13, 2019, the IRS notified Appellants that the Contested Refund was issued erroneously and challenged Cajun's claimed credit. The Commissioner demanded Appellants repay the amount and warned that if Appellants did not do so, the IRS would recommend "an action be commenced in District Court to recover the erroneous refund, as permitted by I.R.C. § 6532(b) and 7405." Shortly thereafter, the United States initiated this suit.

B. The Representative Projects

Before the District Court, the Parties agreed that four projects adequately represented Cajun's research activities: (1) Project 13-020 (the "Methanex Project"); (2) Project 12-051 (the "Chevron Project"); (3) Project 12-001 (the "Claiborne Project"); and (4) Project 12-023 (the "East Bank Project") (together, the "Representative Projects"). Thus,

---

[8] Of the $671,071, $576,756 was "solely due" to Cajun's tax credit and $73,663.38 stemmed from the statutory overpayment interest.

No. 22-30764

Cajun's eligibility for the tax credit, and Appellants' by extension, hinged on whether it performed qualified research while completing these projects.

### 1. The Methanex Project

In 2012, Jacobs Field Services North America, Inc. ("Jacobs") hired Cajun as a subcontractor on a project to relocate a Methanex USA, LLC methanol plant from Chile to Louisiana. Cajun was originally tasked with creating temporary facilities at the new site. According to the Scope of Work provisions of the contract, Cajun's responsibilities included:

> 3.0 GENERAL SCOPE OF SERVICES (WORK)
>
> 3.1 [Cajun] shall complete the Work and support functions required to effectively manage and report on the status of the Work as specified.
>
> 3.2 [Cajun] shall provide all management, supervision, labor, consumable materials, construction equipment, construction aids, tools, services, testing devices, warehousing, supplies, inspections, insurance, fully furnished and equipped offices, communication devices, and all other necessary items to successfully accomplish the construction described by the Scope of Work. This includes, but is not limited to, on and off site transportation, receiving, loading and unloading, storing, maintenance, and distribution of construction materials, installation of such materials into the Work, proper care of materials, testing and final construction punch list completion and turnover of the Work Scope as specified.[9]

In executing these tasks, Cajun was "solely responsible for and have [sic] control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work." This included

---

[9] "Work" was defined as the "work, services, deliverables, duties and activities to be performed or provided by, or on behalf of, [Cajun] under this Subcontract."

No. 22-30764

obtaining approval for materials, identifying and coordinating vendors, offering design input, and participating in "a lot of review processes." However, Jacobs retained "ultimate authority to resolve issues in the field."

The contract was subject to a capped price of $6,485,000 and payment was conditioned on Cajun's completion of "all Work."[10] Cajun accepted payment "as full compensation for doing all Work and furnishing all material contemplated by and embraced in this Subcontract," "for all loss or damage arising out of the nature of the Work," "from any unforeseen or unknown difficulties or obstructions which may arise or be encountered in the prosecution of the Work," and "for all risks of every description connected with the Work."

Section 26 of the contract addressed ownership of any work product and provided that all "Work Product prepared by [Cajun] shall be 'works made for hire,' and all rights, title and interest to the Work Product . . . shall be owned by [Methanex]." To the extent any "work product" was not considered work for hire, "or if ownership of all right, title and interest in the Work Product shall not otherwise vest in [Methanex]," Cajun agreed that ownership of said "Work Product . . . shall be automatically assigned from [Cajun] to [Methanex] without further consideration, and [Methanex] shall thereafter own all right, title and interest in the Work Product."[11]

---

[10] This price included "billed actual manhours and actual cost of other cost reimbursable items in accordance with the agreed labor wage rates, construction equipment rates, mobilization and demobilization rates as included in this Exhibit D." Cajun was also entitled to additional compensation if Jacobs modified its scope of work. By the end of the project, the contract price rose from $6 million to approximately $90 million because of 65 work scope modifications.

[11] The contract defined Methanex as the "Owner."

The contract defined "work product" as "all documents, data, analyses, reports, plans, procedures, manuals, drawings, specifications, calculations, or other technical tangible manifestations of [Cajun]'s efforts (whether written or electronic) created by [Cajun] in the performance of the Work, including but not limited to all Documents." In turn, "documents" included "any or all tracings, designs, drawings, field notes . . . specifications, electronic information . . . and other documents or records developed or acquired by [Cajun] and its suppliers or sub-subcontractors in performing the Work."

### 2. The Chevron Project

In 2011, Chevron Products Company, a division of Chevron U.S.A., Inc., contracted with Cajun to provide construction services to expand Chevron's Pascagoula Refinery (the "Chevron Project"). Cajun's responsibilities included providing "all labor, supervision, quality control, administration, document control, equipment, [and] tools," in addition to completing specific civil tasks such as surveying, excavation and backfill, installing piping, and performing field inspections. Appellants maintain that Cajun also offered "constructability reviews" of the engineer's designs and specifications. However, the engineer of record, who was not a Cajun employee, retained "ultimate authority to resolve any issues that arose in the field."

The Chevron contract was a fixed-price contract and compensated Cajun for all work described in Exhibit B of the contract, the "Schedule of Compensation for Work." Exhibit B detailed all costs covered by the contract price, including craft labor, non-manual, and equipment costs in addition to all overhead and profit. Furthermore, according to the "Pricing" section of the contract, Chevron paid for "performance of all Work" and the contract prices were "all inclusive" of Cajun's "supply and services including without limitation; salaries and wages . . . the cost of supervision and support

services from personnel other than those permanently assigned to the Contract . . . employee income tax and statutory payroll deductions, social security charges, [and] all taxes (except sales and use taxes) . . . ." Cajun agreed that payment "constituted full payment for the performance of the Work, and completion of [Chevron]'s payment obligations under the Contract."

The contract designated Chevron as the owner of all work product generated during the project and provided:

> 2.20.3. All drawings, documents, engineering and other data prepared or furnished by [Cajun] in performing the Work are considered to be [Chevron's] work for hire and shall become [Chevron's] property from the time of preparation and may be used by [Chevron] for any purpose whatsoever without obligation or liability whatsoever to [Cajun]. [Cajun] assigns all rights in the above referenced drawings, documents, engineering and other data to [Chevron], including copyrights.

> [. . .]

> 18.4. All inventions, discoveries and improvements (patentable and unpatentable) that are made or conceived by [Cajun] or [Cajun]'s employees in performing the Services and all domestic and foreign patent rights based thereon shall belong to [Chevron] or an Affiliate designa1ed by [Chevron]. [Cajun] shall promptly and fully disclose all such inventions, discoveries and improvements to [Chevron] or the designated Affiliate.

Furthermore, Cajun agreed that all "Technical Information will be used only for performance of the Services for [Chevron]" and that it would not disclose this information without Chevron's express written consent.[12] This obligation remained in force even after the Chevron Project concluded.

_____

[12] Section 1.1.31 of the contract defined "technical information" as:

No. 22-30764

### 3. The Claiborne Project

In September 2011, Cajun contracted with the U.S. Army Corps of Engineers to construct a "box culvert," or an underground canal, as part of the Southeast Louisiana Urban Flood Control Project (the "Claiborne Project"). In doing so, Cajun was responsible for selecting the means and methods of construction, including equipment selection, personnel decisions, and "how to produce the work in accordance with the plans and specifications." The Claiborne contract was a "fixed price" contract valued at $25,971,694.50.

The contract incorporates various provisions of the Federal Acquisition Regulations ("FAR"), Title 48 of the Code of Federal Regulations, either "by reference" or by "full text." Relevant here, the contract incorporates FAR 52.232. FAR § 52.232-5(f) dictates the ownership rights of any material generated throughout the contract's performance and states "all material and work covered by progress payments made shall, at the time of payment, become the sole property of the Government."[13] "Work" includes "construction activity . . . [including] buildings, structures, and improvements of all types."[14]

---

> [A]ny and all information, data and knowledge which is either made available to [Cajun] by [Chevron] relating to the performance of the Work, or developed by [Cajun] as a consequence or arising out of this Contract. Technical Information includes all inventions, discoveries or improvements (patentable or otherwise) that are made or conceived with by [Cajun] in performing the Work and all patent rights associated these inventions, discoveries or improvements.

[13] FAR § 52.232-5(f), codified as 48 C.F.R. § 52.232-5(f).

[14] Section 00700 of the contract "incorporate[s] by reference" FAR 52.202-1, which provides that "when a solicitation provision or contract clause uses a word or term that is defined in the Federal Acquisition Regulation (FAR), the word or term has the same meaning as the definition in FAR 2.101 in effect at the time the solicitation was

9

No. 22-30764

### 4. The East Bank Project

In January 2012, the Sewerage and Water Board of New Orleans ("SWBNO") awarded Cajun a construction contract to modify the flood protection system at the East Bank Wastewater Treatment Plant in New Orleans. Cajun's scope of work included providing "all labor, materials, supervision, construction equipment, [and] mechanical and electrical equipment."[15]

The East Bank contract was a "firm, fixed-price contract" originally valued just under $24.4 million, although the contract eventually totaled $29.4 million due to changes in the scope of work. Cajun's compensation included payment for "all general foremen, foremen, labor, teams and trucks actually engaged on such specific work for the time actually so employed at the rates actually paid." Compensation also included a "fee for [Cajun's] superintendence, general expense and profit," which "shall be understood also to reimburse [Cajun] for any sub-contractor's general expense and profit which [Cajun] may allow to one or more sub-contractors."

Cajun accepted payment as "full compensation for furnishing all the labor, materials, tools, equipment, etc., needed to complete the whole work of the contract" and also "as full compensation for all loss, damages or risks of every description, connected with or resulting from the nature of the work,

---

issued . . . ." *See* FAR 52.202-1, codified as 48 C.F.R. § 2.101. Thus, the reference to 48 C.F.R. § 52.202-1 effectively incorporates all definitions provided in FAR 2.101. Section 2.101 defines "work" as noted.

[15] Unlike the Methanex, Chevron, and Claiborne projects, Cajun was not solely responsible for the means and methods of executing these tasks. SWBNO hired an engineering firm, Burk-Kleinpeter, Inc. ("BKI") to design the system modification(s). BKI oversaw Cajun's daily construction activities and was required to approve Cajun's means and methods and any materials Cajun selected for permanent features of the project.

or from any obstructions or difficulties encountered, of any sort or nature whatsoever[.]"

The East Bank contract contained no provisions relating to ownership of work product or research developed during the project.

## C. District Court Proceedings

Throughout discovery, Appellants claimed Cajun engaged in research which led to the development of four new "products:" two oil refineries and two flood control systems. When the United States moved for summary judgment, the Government argued these products failed the "business component[s]" test and, as such, that Cajun did not perform qualified research. Furthermore, the Government claimed the Representative Projects were otherwise ineligible for the credit because they were "funded."

Appellants responded that Cajun had also developed "processes" that amounted to business components, in addition to the "products" identified during discovery. Appellants claimed their new "processes" encompassed the various "construction means and methods" Cajun used to perform on its contracts and develop these products. Appellants also disputed that the Representative Projects were funded, and maintained that Cajun retained substantial rights to its "research results." Alternatively, Appellants contended that the contracts were contingent upon Cajun's provision of deliverables and were not funded, as set out in 26 C.F.R. § 1.41-4A(d).

The District Court granted the United States's motion for summary judgment on three bases. First, the District Court rejected Appellants' "processes" argument pursuant to Federal Rule of Civil Procedure 37(c)(1) because this argument was inconsistent with Cajun's prior discovery disclosures which, instead, "unequivocally state that, as to each

Representative Project, Cajun developed a 'product.'"[16] The District Court further found that Appellants' construction processes claim failed for lack of specificity because Appellants "fail[ed] to specifically identify even *one* new or improved process that resulted from Cajun's work on the Representative Projects."

Second, the District Court found that Appellants' briefing "fail[ed] to cite any evidence or offer any argument establishing that Cajun's work on the Representative Projects resulted in new 'products.'" Because the excluded evidence of any construction processes was the "*only* evidence (*and* argument) offered to establish the business component element of their QRTC claim," the court concluded the Representative Projects failed to establish a business component.

Third, as an alternative basis for its holding, the District Court held that the Representative Projects were "funded." In particular, the District Court determined that the Methanex, Chevron, and Claiborne Projects failed the substantial rights prong of the "funded research exclusion," and that the East Bank contract was funded because Cajun was fully compensated for any research performed or risk incurred.

Appellants timely appealed. This Court has jurisdiction under 28 U.S.C. § 1291.

---

[16] "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

No. 22-30764

## II.

We review a district court's grant of summary judgment de novo, applying the same standard as the district court.[17] Grants of summary judgment may be affirmed for any reason raised to the district court and supported by the record, and we are not bound by the grounds articulated by the district court.[18] Decisions to exclude evidence under Federal Rule of Civil Procedure 37 are reviewed for abuse of discretion.[19]

## III.

Appellants advance three arguments on appeal. None are persuasive.

### A. Burden on Summary Judgment

The District Court granted summary judgment after finding Appellants did not "offer competent evidence or argument establishing that Cajun performed qualified research," namely on the business components element. Appellants argue that this improperly placed the burden on Appellants as the non-moving party at summary judgment.

It is well established that the IRS's assessment of tax liability may be presumed correct so long as it is not "without rational foundation and excessive."[20] The Government satisfies this burden by "specify[ing] the

---

[17] *Roberts v. City of Shreveport*, 397 F.3d 287, 291 (5th Cir. 2005).

[18] *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1146 (5th Cir. 1993).

[19] *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 277 (5th Cir. 2009).

[20] *United States v. Janis*, 428 U.S. 433, 441 (1976); *Portillo v. Comm'r*, 932 F.2d 1128, 1133 (5th Cir. 1991) ("[W]e begin with the well settled principle that the government's deficiency assessment is generally afforded a presumption of correctness . . . The tax collector's presumption of correctness has a herculean muscularity of Goliathlike reach, but we strike an Achilles' heel when we find no muscles, no tendons, no ligaments of fact.") (internal citations omitted); *Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 386 (5th Cir. 1995) ("A determination of deficiency issued by the Commissioner is generally given a

No. 22-30764

amount of the deficiency or provid[ing] the information necessary to compute the deficiency."[21] Once an assessment is presumed correct, the burden shifts to the taxpayer to rebut the presumption.[22] Importantly, the taxpayer bears this burden regardless of whether the case is a refund suit

---

presumption of correctness, which operates to place on the taxpayer the burden of producing evidence showing that the Commissioner's determination is incorrect.").

[21] *Sealy*, 46 F.3d at 386. At oral argument, Appellants' counsel argued that the IRS assessment was insufficient because it did not result from an administrative proceeding. However, Appellants provided no citations for this proposition and the Court has found none in support of this position. To the contrary, this Court in *Portillo* recognized that "there is no prescribed form for a deficiency notice," *Portillo*, 932 F.2d at 1132 (citing *Donley v. Comm'r*, 791 F.2d 383 (5th Cir. 1986)), and such notice must merely evince "a thoughtful and considered determination that the United States is entitled to an amount not yet paid," *id*. (quoting *Scar v. Comm'r*, 814 F.2d 1363, 1369 (9th Cir. 1987)).

[22] *Portillo*, 932 F.2d at 1133 ("This presumption is a procedural device that places the burden of producing evidence to rebut the presumption on the taxpayer."). The presumption is consistent with the general principle that taxpayers must demonstrate their entitlement to any refund, deduction, or credit as well as the taxpayer's record-keeping obligations imposed by the Revenue Code. *See id*. at 1134 ("The taxpayer clearly bears the burden of proof in substantiating claimed deductions."); *United States v. McFerrin*, 570 F.3d 672, 675 (5th Cir. 2009) ("Tax credits are a matter of legislative grace, are only allowed as clearly provided for by statute, and are narrowly construed."); 26 U.S.C. § 6001 ("Every person liable for any tax imposed by this title, or for the collection thereof, *shall keep such records,* render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe.") (emphasis added); 26 C.F.R. § 1.6001-1(a) ("Except [for farmers and wage-earners], any person subject to tax under subtitle A of the Code . . . or any person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of *gross income, deductions, credits,* or other matters required to be shown by such person in any return of such tax or information.") (emphasis added); 26 C.F.R. § 1.41-4(d)("Recordkeeping for the research credit. A taxpayer claiming a credit under section 41 must retain records in sufficiently usable form and detail to substantiate that the expenditures claimed are eligible for the credit.").

initiated by the taxpayer or a collection suit brought by the Government.[23] Thus, ultimately, "[t]he burden and the presumption, which are for the most part but the opposite sides of a single coin, combine to require the taxpayer always to prove by a preponderance of the evidence that the Commissioner's determination was erroneous."[24]

The IRS assessment in this case was entitled to the presumption of correctness. This burden is a low one; the assessment must merely "advise the taxpayer that the [IRS] has determined that a deficiency exists for a particular year," and "specify the amount of the deficiency or provide the information necessary to compute the deficiency."[25] The IRS's August 13, 2019, letter to Appellants (the "Letter") met these requirements.[26] Thus, the burden shifted to Appellants to refute the IRS's determination. Therefore, the District Court properly required Appellants to introduce evidence on this point to establish a genuine dispute meriting trial.

Moreover, even if the IRS's assessment was not entitled to the presumption of correctness, the Government still met its burden of

---

[23] *Carson v. United States*, 560 F.2d 693, 696 (5th Cir. 1977) ("This burden applies whether the proceeding is in Tax Court for redetermination of a deficiency or in district court upon a refund claim or a government counterclaim.").

[24] *Id.* at 695–96.

[25] *Portillo*, 932 F.2d at 1132 (5th Cir. 1991) (internal citation omitted); *see also Sealy*, 46 F.3d at 386 (same).

[26] The Letter recounted that Appellants requested a tax credit of $576,756 for the 2013 tax year and received a total refund of $671,071.38, which was comprised of Appellants' $576,756 claimed research credit plus $73,663.38 in statutory interest and an additional, undisputed, refund of $20,652. It further explained that the $576,756 refund was "solely due to information" reported on Appellants' amended return which, in turn, was based on Cajun's Amended Form 1120S. Because the IRS "determined that Cajun Industries, LLC & Subsidiaries is not entitled to the Research Credit claimed," the Letter concluded that the "refund resulting from the Research Credit should not have been allowed and the refund paid to [Appellants] was erroneous."

No. 22-30764

production at summary judgment. As the moving party, the Government needed to show that there was no genuine dispute as to any material fact and that it was entitled to judgment as a matter of law.[27] The Government could do so by submitting evidence negating the existence of some material element of Appellants' claim or defense; alternatively, because taxpayers must demonstrate their entitlement to credits, the Government could have pointed out that the evidence in the record was insufficient to support Appellants' claim that they performed qualified research.[28]

The Government did so by providing approximately forty exhibits—including excerpts from the Representative Projects' contracts, Appellants' 2013 amended tax return, and corporate representative depositions from parties to the Methanex, Chevron, Claiborne, and the East Bank Projects—that refuted Appellants' entitlement to the credit. At that point, the District Court was correct in offering Appellants the opportunity to rebut this evidence and thus create a genuine issue of fact. The District Court did not err on this basis.

---

[27] FED. R. CIV. P. 56(a).

[28] *See Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en banc*, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

No. 22-30764

### B. Business Components Determination

Research must satisfy the so-called "business components" test in order to qualify for the tax credit.[29] The business components test requires that research be "undertaken for the purpose of discovering information (i) which is technological in nature, and (ii) the application of which is intended to be useful in the development of a new or improved business component of the taxpayer."[30] The test must be applied separately to each business component, defined as "any product, process, computer software, technique, formula, or invention which is to be (i) held for sale, lease, or license, or (ii) used by the taxpayer in a trade or business of the taxpayer."[31]

During discovery, Appellants stated that they developed four new "products:" two oil refineries and two flood control systems. At summary judgment, however, Appellants claimed Cajun also created new business processes, a separate type of business component, which Appellants define as the "means and methods of construction," "the means and methods of performing [] construction services," and "construction processes."

The District Court found that the asserted products and processes did not satisfy the business components test because Appellants put forth no evidence of the alleged products, any assertions of new construction processes were inconsistent with their prior disclosures and excludable under Federal Rule of Civil Procedure 37, and notwithstanding those inconsistencies, Appellants did not specifically identify the new construction processes at issue.[32]

---

[29] 26 U.S.C. § 41(d)(1)(B).

[30] *Id.*

[31] *Id.* § 41(d)(2)(B).

[32] *See* FED. R. CIV. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or

No. 22-30764

Appellants now argue that the District Court's determinations were in error.

### 1. Business Components: Products

Appellants argue they presented sufficient evidence that Cajun developed four business component products and cite to the "Taxpayers' Response to Proposed Statement of Facts" (the "Response") as support. However, cited provisions primarily describe Cajun's "means and methods," i.e., their processes, and not the products. While Appellants may be correct that their construction processes led to the final product, the Revenue Code requires this Court to evaluate each business component separately.[33]

Accordingly, Appellants have not created a genuine dispute as to whether the four products constitute business components.

### 2. Business Components: Processes

Appellants further assert the District Court erred in excluding their construction processes argument because the "development processes and techniques" used on the Representative Projects were "almost inextricably intertwined with the tangible deliverables," the final product.

We are not persuaded that the District Court's decision to exclude Appellants' construction processes claim was an abuse of discretion.[34]

---

witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

[33] 26 U.S.C. § 41 (d)(2)(A); *see also id.* § 41(d)(2)(C) ("Special rule for production processes.--Any plant process, machinery, or technique for commercial production of a business component shall be treated as a separate business component (and not as part of the business component being produced).").

[34] *CQ, Inc.*, 565 F.3d at 277.

Federal Rule of Civil Procedure 37(c)(1) provides that "if a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[35] To evaluate whether a Rule 26 violation was harmless, and "thus whether the district court was within its discretion in allowing the evidence to be used at trial," this Court weighs four factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose.[36]

First, the argument that Cajun developed new construction processes is important because it provided Appellants with a wholly new basis by which to claim the tax credit. By raising this argument for the first time at summary judgment, Appellants effectively asserted a new defense that was neither disclosed nor explored during discovery. Moreover, as the District Court noted, "evidence of Cajun's new construction processes is plainly important to [Appellants] insofar as it is the *only* evidence (*and* argument) offered to establish the business component element of their QRTC claim."

Second, this omission was highly prejudicial to the Government given the procedural posture of the case. The record reflects that Cajun's initial discovery responses described the business components for the Representative Projects as "products." Appellants' supplemental disclosures likewise describe the Projects as producing "product[s]." By raising the processes argument at summary judgment, Appellants deprived the Government of the opportunity investigate this claim.

---

[35] Fed. R. Civ. P. 37(c)(1).

[36] *Texas A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 401–02 (5th Cir. 2003).

Third, although the District Court acknowledged that reopening discovery would mitigate prejudice to the Government, the case was "more than three years old" and one month from trial. The District Court was entitled to weigh the value of reopening discovery against providing a timely resolution of the case.[37]

Finally, Appellants failed to explain their change in argument before the District Court and, before this Court, deny that any change occurred. In doing so, Appellants direct the Court to their "pretrial briefing" as evidence that Appellants' position has remained consistent. However, the cited pretrial briefing is the Parties' Joint Pretrial Order, which was filed over one month *after* the Government moved for summary judgment and three weeks *after* Appellants responded raising the construction process argument for the first time. Appellants have not directed the Court to any previous statements indicating that the claimed business components involved processes. This explanation is thus unpersuasive.

Given these facts, the District Court did not abuse its discretion in excluding Appellants' arguments about construction processes. However, even if the District Court abused its discretion, the error was harmless because the court nonetheless evaluated the merits of Appellants' claim. Ultimately, the District Court determined that Appellants put forth "vague" and "conclusory" statements regarding their construction processes without identifying "even *one* new or improved process that resulted from Cajun's work on the Representative Projects."

---

[37] A district court has "broad discretion in all discovery matters," and "such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (internal citation omitted).

No. 22-30764

The District Court did not abuse its discretion in excluding evidence of Cajun's construction processes. Alternatively, Appellants did not offer sufficient evidence to create a genuine dispute as to whether Cajun's products or processes constituted business components. Without a viable business component, the Representative Projects are not eligible for the tax credit, and the Government is entitled to summary judgment as a matter of law.

### C. Funding Exclusion

Qualified research excludes "funded" research projects.[38] Funded research include "any research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity)."[39] To determine whether research was funded, courts must first evaluate "all agreements (not only research contracts) entered into between the taxpayer performing the research and other persons."[40] Research is funded if: (1) the researcher retains no substantial rights in its research;[41] or (2) payment is not contingent upon the research's success.[42]

The District Court determined that "the Methanex, Chevron, and Claiborne Projects each fail the 'substantial rights' prong of the 'funded

---

[38] 26 U.S.C. § 41 (d)(4)(H).

[39] *Id.*

[40] 26 C.F.R. § 1.41-4A(d)(1).

[41] *Id.* § 41-4A(d)(2)("If a taxpayer performing research for another person retains no substantial rights in research under the agreement providing for the research, the research is treated as fully funded for purposes of section 41(d)(4)(H), and no expenses paid or incurred by the taxpayer in performing the research are qualified research expenses.").

[42] *Id.* § 1.41-4A(d)(1)("Amounts payable under any agreement that are contingent on the success of the research and thus considered to be paid for the product or result of the research (see § 1.41–2(e)(2)) are not treated as funding.").

research' exclusion because in each instance Cajun transferred *all* rights to any new or improved 'construction processes' to its contracting counterpart." The Court found that the East Bank contract was funded because "SWBNO plainly *paid* Cajun for whatever alleged research Cajun may have performed."

On appeal, Appellants dispute this finding and argue (1) that Cajun retained substantial rights in its research, and (2) that the Representative contracts were "contingent" upon delivery of a product and, as such, are not funded as defined by Treasury Regulation 26 C.F.R. § 1.41-4A(d).

### 1. Methanex, Chevron, and Claiborne Projects

Researchers cannot claim the tax credit if they retain no "substantial rights in research under the agreement providing for the research."[43] A researcher retains no "substantial rights" if the agreement or contract "confers on another person the exclusive right to exploit the results of the research."[44] Whether Cajun retained substantial rights to its research is determined by the contracts for each Representative Project.[45]

Even assuming Cajun satisfied the business components test, by the express terms of the Methanex, Chevron, and Claiborne contracts, Cajun gave up its rights to any research performed under the contracts. Pursuant to section 26 of the Methanex contract, Methanex retained "all rights, title and interest" in any "work product" prepared by Cajun. The provision applies to all "works made for hire" as well as any work "not considered a work

---

[43] 26 C.F.R. §1.41-4A(d)(2).

[44] *Id.*

[45] *Id.* § 1.41-4A(d)(1) ("All agreements (not only research contracts) entered into between the taxpayer performing the research and other persons shall be considered in determining the extent to which the research is funded.").

No. 22-30764

made for hire." By contracting away "all right, title and interest" in its work product, Cajun gave up its rights to all "documents, data, analyses, reports, plans, procedures, manuals, drawings, specifications, calculations, or other technical tangible manifestations of [Cajun]'s efforts (whether written or electronic)" created while performing the contract, as well as "any or all tracings, designs, drawings, field notes, requisitions, purchase orders, specifications, electronic information . . . and other documents or records developed or acquired by [Cajun] and its suppliers or sub-subcontractors in performing the Work."

Similarly, Cajun assigned to Chevron "all rights" to any "drawings, documents, engineering and other data prepared or furnished by [Cajun]" under the Chevron contract. These items became "[Chevron's] property from the time of preparation and may be used by [Chevron] for any purpose whatsoever without obligation or liability whatsoever to [Cajun]." Further-more, the contract also states that Chevron owns all "inventions, discoveries and improvements (patentable and unpatentable) that are made or conceived by [Cajun] or [Cajun's] employees" during the Project. Cajun was permitted to use this information "only for performance of the Services for [Chev-ron]," and pledged not to disclose such information "to any third party with-out [Chevron's] express written consent." Importantly, this obligation per-sists "notwithstanding the termination of this Contract."

Finally, by incorporating various provisions of the Federal Acquisition Regulations, the Claiborne contract provides that "all material and work cov-ered by progress payments made shall, at the time of payment, become the sole property of the Government."[46] "Work" is defined broadly and includes

---

[46] FAR § 52.232-5(f), codified as 48 C.F.R. § 52.232-5.

"construction activity," "buildings, structures, and improvements of all types."

Ultimately, "it is hard to see what rights—much less what substantial rights" Cajun retained in its undefined research.[47] After assigning away all rights to work developed during each Representative Project, Cajun retained no substantial rights in its research.[48]

### 2. East Bank Project

Treasury Regulation 26 C.F.R. § 1.41-4A(d) defines "funded" research.[49] Relevant here, the Regulation explains that "amounts payable under any agreement that are contingent on the success of the research and thus considered to be paid for the product or result of the research (see § 1.41–2(e)(2)) are not treated as funding . . . ."[50]

---

[47] *Tangel v. Comm'r of Internal Revenue*, 121 T.C.M. (CCH) 1001, 2021 WL 81731, at *6 (T.C. 2021) (internal quotations omitted).

[48] Appellants argue Cajun retained substantial rights to its research because "there is nothing [in the contracts] that precludes Cajun from performing the same types of activities and utilizing the same means and methods on other projects, or building other flood structures, or modifying refineries." However, Appellants provided no specific examples of these "means and methods," leaving the district court and this Court to guess what Cajun could bring to future projects aside from additional experience in its field. "[I]ncreased experience in a field of research" does not constitute substantial rights to research. 26 C.F.R. § 1.41-4A(d)(2).

[49] 26 C.F.R. § 1.41-4A(d).

[50] *Id.* § 1.41-4A(d)(1). Together, 26 C.F.R. §§ 1.41-2(e) and 1.41-4A(d) provide "mirror image" rules "for determining when the customer for the research, rather than the researcher, is entitled to claim the tax credit." *Fairchild Indus., Inc. v. United States*, 71 F.3d 868, 870 (Fed. Cir. 1995), *modified* (Feb. 23, 1996). *Fairchild* interpreted 26 C.F.R § 1.41-5, which was redesignated as § 1.41-4A in 2001. *See* Credit for Increasing Research Activities, 66 Fed. Reg. 280, 295 (2001). Section § 1.41-4A addresses when a researcher can claim the credit, whereas § 1.41-2(e) addresses when the payor to a contract can (or cannot) claim it.

Accordingly, § 1.41-2(e)(2) explains that payors cannot claim expenses for research contracts "if an expense is paid or incurred pursuant to an agreement under which

No. 22-30764

Appellants offer three reasons why the East Bank Project was not funded. First, Appellants rely on 26 C.F.R. § 1.41-4A(d) and 26 C.F.R. § 1.41-2(e) to argue the East Bank Project was not funded because payment was contingent upon Cajun delivering a "result or product," the refineries and flood systems. Second, and relatedly, Appellants maintain they are entitled to the credit simply because SWBNO, the payor on the East Bank Project, was not. Finally, Appellants argue that the Project was not funded because it was "inherently risky." These arguments miss the mark.

Appellants' argument that all contracts "for the product or result" are not funded improperly conflates "amounts payable under any agreement that are contingent on the success of the research" with contracts for products or services. This argument ignores the operative portion of the sentence: "amounts payable under any agreement that are contingent on the success of the research." Structurally, the phrase "and thus considered to be paid for the product or result of the research" merely describes or modifies "amounts payable . . . contingent on the success of the research." It does not, as Appellants urge, stand on its own to establish an additional type of contract "not treated as funding."

More to the point, § 1.41-4A(d)(1) only concerns agreements contingent upon the success of research. Simply put, the East Bank contract was not contingent on the success of the research because Appellants admit that "none of Cajun Industries' payment was for merely conducting research." Indeed, Appellants' briefing admits "payments to Cajun

---

payment is contingent on the success of the research" because "the expense is considered paid for the product or result rather than the performance of the research." 26 C.F.R. § 1.41-2(e)(2). In doing so, "the regulations implement allocation of the tax credit to the person that bears the financial risk of failure of the research to produce the desired product or result." *Fairchild*, 71 F.3d at 870.

Industries were not contingent upon whether Cajun Industries conducted research activities." Consequently, this argument lacks merit.

Furthermore, Appellants are not entitled to the research credit merely because SWBNO could not claim the credit. The Regulations do not require that a tax credit be allocated in every contract.[51]

Third, Appellants assert the East Bank Project was not funded because it was a fixed price contract and "inherently risky." This argument stands on more solid ground and finds some support in a line of cases including *Fairchild Industries, Inc. v. United States* and *Geosyntec Consultants, Inc. v. United States*.[52] *Fairchild* explained that sections 1.41-2 and 1.41-4A "implement allocation of the tax credit to the person that bears the financial risk of failure of the research to produce the desired product or result."[53] Because fixed price contracts may not fully compensate researchers if their research is unsuccessful, the researcher bears the financial risk of failure, and fixed price contracts are more likely to be deemed unfunded.

However, *Fairchild* and *Geosyntec* do not stand for the proposition that all fixed price contracts are per se not funded. Indeed, *Geosyntec* found that the fixed price contract at issue *was* funded.[54] Furthermore, even if this Court

---

[51] *See* 26 C.F.R. § 1.41-A(d)(2) (addressing a scenario in which "a taxpayer performing research for another person retains no substantial rights in the research and if the payments to the researcher are contingent upon the success of the research, *neither the performer nor the person paying for the research* is entitled to treat any portion of the expenditures as qualified research expenditures.") (emphasis added).

[52] *Fairchild*, 71 F.3d at 870; *Geosyntec Consultants, Inc. v. United States*, 776 F.3d 1330 (11th Cir. 2015).

[53]*Fairchild*, 71 F.3d at 870.

[54] *Geosyntec*, 776 F.3d at 1339 ("[W]e find that both the Cherry Island Contract and the WM Contract were 'funded' as that term is used in § 41 and Treasury Regulation § 1.41–4A(d).").

agreed that the Regulations allocate the tax credit to the party bearing the risk of unsuccessful research, Cajun was compensated for all risks associated with the East Bank Project. According to the express terms of the contract, Cajun accepted payment "as full compensation for all loss, damages or risks of every description, connected with or resulting from the nature of the work, or from any obstructions or difficulties encountered, of any sort or nature whatsoever . . . ."

Finally, the East Bank Project was funded for the simple reason that Cajun was compensated for all expenditures incurred and claimed when it sought the tax credit. According to Cajun's IRS Form 6765, Cajun claimed the research credit entirely for "wages" incurred in pursuit of qualified services.[55] However, Cajun was compensated under the East Bank contract for "all general foremen, foremen, labor, [and] teams" as well as Cajun's "superintendence, general expense and profit." Cajun accepted this payment as "full compensation for furnishing all the labor, materials, tools, equipment, etc., needed to complete the whole work of the contract." Therefore, Cajun was fully compensated for all wages and labor, making these expenditures funded under any plain meaning of the term.[56]

---

[55] Although Appellants' brief claims that "Cajun Industries included portions of employee wages, contractor costs, and supply costs incurred for various construction projects as part of the computation of the R&D tax credits," their tax filings indicate otherwise. In its Form 6567, Cajun left blank spots next to the "cost of supplies" category. To the extent Appellants argue Cajun claimed the credit for the difference between compensation received and wages paid, Appellants bore the burden of demonstrated this value before the District Court and on appeal. They provided no such calculations.

[56] *See also* 26 C.F.R. § 1.41-4A (Example 1, indicating if a researcher is wholly compensated for otherwise qualified expenditures, the researcher is not entitled to the credit, notwithstanding any rights retained in the research).

No. 22-30764

## IV.

Based upon the record before the District Court and arguments made on appeal, the Court finds that the Representative Projects yielded no viable business components and were funded. Appellants are ineligible for the research tax credit provided by 26 U.S.C. § 41. Therefore, the District Court's grant of summary judgment is AFFIRMED.